**Susan KULAKOSKI, Plaintiff,**

v.

**Jo Anne B. BARNHART,
Commissioner of Social
Security, Defendant.**

**No. 01CV2532(ADS).**

United States District Court,
E.D. New York.

July 20, 2002.

Susan Kulakoski, Glen Cove, NY, Plaintiff Pro Se.

Alan Vinegrad, United States Attorney, by Assistant United States Attorney Susan L. Riley, Central Islip, NY, for Defendant.

### MEMORANDUM OF DECISION AND ORDER

SPATT, District Judge.

The *Pro Se* plaintiff Susan Kulakoski ("Kulakoski" or the "plaintiff") commenced this action pursuant to the Social Security Act, 42 U.S.C. § 405(g) (the "Act"), seeking review of a final administrative determination of the defendant the Commissioner of the Social Security Administration (the "defendant" or the "Commissioner") denying her application for Social Security Disability Insurance Benefits. In particu-

lar, the plaintiff challenges the Commissioner's finding that she was not "disabled" prior to September 30, 1993, the date that her insured status expired under the Act. Presently before the Court is a motion by the Commissioner for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure.

## I. BACKGROUND

### A. The Procedural History

On July 9, 1996, the plaintiff filed an application for disability insurance benefits with the Department of Health and Human Services of the Social Security Administration (the "DHHS"). In her application, the plaintiff claimed that she suffered from medical problems involving her back, neck and left ankle which have rendered her unable to work as of February 25, 1991. On September 12, 1996, the DHHS denied her application. Shortly thereafter, the plaintiff sought reconsideration of this decision. On October 10, 1997, the DHHS denied her application for reconsideration. Thereafter, the plaintiff requested a hearing on her claim for benefits.

On April 20, 1998, Administrative Law Judge Jerry L. Bassett (the "ALJ") held a hearing on the plaintiff's claim for disability insurance benefits. The plaintiff and her attorney participated in the hearing. On May 5, 1998, the ALJ concluded that the plaintiff was not entitled to disability insurance benefits because she was not disabled on or before September 30, 1993. *In the Case of Susan Kulakoski,* Administrative Hearing at 5 (May 5, 1998). On March 2, 2001, the Appeals Counsel of the Social Security Administration (the "Appeals Council") denied the plaintiff's request for review of the ALJ's decision.

### B. The Plaintiff's Testimony at the Hearing

At the hearing of April 20, 1998, the plaintiff stated that she was born on October 15, 1962. From 1987 to February of 1991, the plaintiff was employed as a secretary/typist. The plaintiff's duties as a secretary/typist involved mostly sitting, filing and lifting files. As to her alleged disability, the plaintiff stated that she had a congenital cyst in her spinal cord which caused her to suffer pain in her neck and spinal cord. As a result of the pain caused by the cyst, the plaintiff stopped working. The plaintiff stated that the cyst could not be removed and that her neurologist advised her to return for evaluations every two years.

For treatment, the plaintiff received acupuncture and manipulations from her chiropractor every three weeks and took thyroid medication to alleviate her pain. The plaintiff stated that she lived with her mother who performed the housework, cooking, cleaning and shopping. The plaintiff stated further that she was able to exercise and stretch her neck. Before she stopped working in 1991, the plaintiff stated that she was able to sit and stand for a maximum of fifteen to twenty minutes and walk a couple of blocks. The plaintiff's earnings records indicated that she met the special insured status requirements of the Act only through September 30, 1993.

### C. The Medical Evidence

#### 1. Pre–September 30, 1993

#### a. Dr. John Stewart III

In 1989, Dr. John Stewart III, the plaintiff's treating orthopedist, evaluated the plaintiff for lower back problems. On August 25, 1989, the plaintiff complained of lower back and cervical pain. Dr. Stewart noted that the physical examination indicated normal neurological findings of her

lower extremities and full motion of her shoulders. Dr. Stewart's diagnosis was that the plaintiff suffered from cervical strain.

### b. Dr. Fredrick Mortati

On September 19, 1989, Dr. Frederick Mortati, the plaintiff's treating neurologist, evaluated the plaintiff's complaints of lower back pain and a pinching sensation involving her cervical region. In a letter dated September 25, 1989, Dr. Mortati noted that a recent MRI scan of the plaintiff's cervical spine demonstrated that she suffered from syringomyelia, which is a disorder that involves the abnormal collection of cerebral fluid in the spine that is often referred to as a syrinx or a cyst. Common symptoms include pain, weakness and stiffness in the back, shoulders, arms or legs. In the letter of September 25, 1989, Dr. Mortati noted that the plaintiff complained of some neck pain. Nevertheless, Dr. Mortati noted that the plaintiff's muscle strength and tone were intact and within normal limits. Also, Dr. Mortati stated that the plaintiff had poor posture but no skeletal deformities.

On January 29, 1991, the plaintiff met with Dr. Mortati regarding her spinal complaints and her syringomyelia. At that time, the plaintiff continued to experience intermittent numbness in her left 4th and 5th fingers and her ulnar palm. The plaintiff stated that she continued to receive neck manipulations from her chiropractor. Dr. Mortati noted that a repeat MRI scan of the plaintiff's cervical spine indicated that the cervical syrinx was unchanged in size. Dr. Mortati stated that the plaintiff had mild dysmorphic features. Dr. Mortati further noted that the plaintiff had good but slightly incomplete range of motion of her cervical spine and that the strength in her extremities was within normal limits.

On February 6, 1991, Dr. Mortati met with the plaintiff for a Electromyography ("EMG") and a Nerve Conduction Study test. The study indicated that the plaintiff's syringomyelia at C6 to T2 was asymptomatic. The EMG was unremarkable. At that time, the plaintiff stated that she continued to suffer from numbness in her left 4th and 5th finger and her ulnar palm. In addition, Dr. Mortati stated that the plaintiff's deep tendon reflexes were symmetrically active.

More than two years later, on July 13, 1993, the plaintiff returned to Dr. Mortati for another examination. The plaintiff stated that her condition was unchanged since her last visit with him in February of 1991, and that she continued to receive chiropractic treatment. The plaintiff's chief complaint was tightness and intermittent pain involving her cervical and upper thoracic region. The plaintiff noted further that her lower back pain was present to only a minimal degree and that she no longer had any numbness in the left 4th and 5th fingers.

During the July 13, 1993 examination, Dr. Mortati noted that the plaintiff's motor, reflex and sensory testing were intact. Dr. Mortati diagnosed the plaintiff with cervical and upper thoracic paraspinal muscle tightness which is likely on a musculoskeletal basis. Also, Dr. Mortati diagnosed the plaintiff with asymptomatic cervical and possible thoracic syringomyelia. Finally, Dr. Mortati recommended that the plaintiff return for a follow-up visit in two years.

### 2. Post–September 30, 1993

#### a. Dr. Susan Jacoby–Berlin

On September 1, 1994, the plaintiff sought a second opinion of her neurological status from Dr. Susan Jacoby Berlin. At that time, Dr. Jacoby Berlin noted that the plaintiff had syringomyelia from C6 to T2.

The neurological examination administered by Dr. Jacoby Berlin revealed that the plaintiff's motor strength was five out of five bilaterally with good rapid alternating movements throughout. In addition, the neurological examination indicated that the plaintiff's reflexes were normal.

On February 24, 1996, an MRI done at the request of Dr. Jacoby Berlin, indicated that there was no significant change in the cervical cord syrinx which extended from C6–7 to T2–3. On August 27, 1996, Dr. Jacoby Berlin completed a medical report for determination of disability for the plaintiff. In her report, Dr. Jacoby Berlin stated that she re-examined the plaintiff on August 27, 1996 and found that the plaintiff was able to lift less than ten pounds, stand and walk for two hours and sit for less than six hours during an eight hour workday. On October 10, 1996, Dr. Jacoby Berlin noted that the plaintiff was "totally disabled" and unable to work.

#### b. Dr. Joseph Lopez

On May 14, 1996, Dr. Joseph Lopez the plaintiff's treating orthopedist examined the plaintiff. After the examination, Dr. Lopez prepared a medical report with regard to her disability. In his medical report, Dr. Lopez diagnosed the plaintiff with cervical cord syrinx and a herniated lumbar disc. The plaintiff complained of severe pain to her neck, back, arms and legs. Dr. Lopez noted that the plaintiff could do less than sedentary work. Dr. Lopez stated that the plaintiff could lift less than five pounds, stand and walk for one hour and sit for two hours in an eight hour day.

#### c. Dr. Charles Ventresca

In June of 1996, the plaintiff met with Dr. Charles Ventresca the plaintiff's treating chiropractor for her chronic back pain. On August 18, 1997, Dr. Ventresca noted that the plaintiff suffered from a multi-level cyst on her spinal chord which caused constant and severe neck pain. Dr. Ventresca stated that the plaintiff was totally disabled and she was unable to work in his professional opinion. On September 27, 1996, Dr. Ventresca noted that the plaintiff's chronic pain limited her to lifting five pounds or less, standing and walking for one hour during an eight hour workday.

#### d. Dr. Barbara Keber

On January 16, 1998, Dr. Barbara Keber the plaintiff's primary care physician noted that the plaintiff was totally disabled and unable to work. Dr. Keber stated that the plaintiff could lift up to five pounds and could stand one to two hours and sit one to two hours over the course of an eight hour workday.

### 3. The Post–Hearing Medical Evidence

After the decision of the ALJ, the plaintiff submitted additional medical evidence to the Appeals Council which was considered on appeal.

#### a. Dr. Joseph Lopez

In an examination note of May 14, 1996, Dr. Joseph Lopez stated that an MRI test of the plaintiff's cervical spine showed evidence of a syrinx which cannot be treated. Also, Dr. Lopez noted that the plaintiff complained of chronic neck, back and left ankle pain which have rendered her unable to work.

#### b. Dr. Daniel Sciarra

On June 18, 1998, Dr. Daniel Sciarra the plaintiff's examining neurologist evaluated the plaintiff for the first time. On August 15, 1998, Dr. Sciarra prepared a medical report with regard to the plaintiff's disability based upon his first examination of the plaintiff. Dr. Sciarra diagnosed the plain-

tiff with syringomyelia. Dr. Sciarra noted that the plaintiff was able to lift up to twenty pounds occasionally and ten pounds frequently. In addition, Dr. Sciarra stated that the plaintiff was able to stand and walk about two hours a day and was able to sit up to six hours a day.

On September 17, 1998, Dr. Sciarra drafted a letter to Dr. Keber containing a summary of the plaintiff's medical history. Dr. Sciarra noted that it was his clinical impression that the plaintiff had syringomyelia. In addition, Dr. Sciarra stated that the plaintiff remained incapacitated. On September 17, 1999, Dr. Sciarra drafted a letter to Dr. Keber stating that the plaintiff's condition remained the same.

### 4. The Disability Determination and Transmittal

On October 10, 1997, the DHHS issued a Disability Determination and Transmittal as to the plaintiff's claim for disability insurance benefits. The DHHS found that the plaintiff was not disabled at any time on or before September 30, 1993, the last date upon which the plaintiff was entitled to disability benefits under the Act.

### D. The ALJ's Findings

As stated above, on April 20, 1998, the ALJ held a hearing in connection with the plaintiff's claim for disability insurance benefits. On May 5, 1998, the ALJ concluded based upon the evidence at the hearing that the plaintiff was not entitled to disability insurance benefits because she was not disabled on or before September 30, 1993. *In the Case of Susan Kulakoski,* Administrative Hearing at 5 (May 5, 1998). In his decision, the ALJ made the following findings:

1. The claimant met the special insured status requirements of the Social Security Act on February 25, 1991, and last met them on September 30, 1993.

2. The claimant has not engaged in substantial gainful activity since February 25, 1991.

3. The medical evidence establishes that on or prior to September 30, 1993, the claimant was impaired by syringomyelia of the cervical and possible thoracic spine and two small herniated discs in the lumbosacral spine, but does not establish medical findings which met or equaled in severity the clinical criteria of any impairment listed in Appendix 1, Subpart P, Part 404 of the Regulations.

4. To the extent that the claimant's testimony concerning her conditions and limitations was not supported by objective medical evidence of an impairment or impairments likely to result in what was alleged on or prior to September 30, 1993, said testimony was not persuasive.

5. The claimant, despite her impairments, remained capable, on or prior to September 30, 1993, of sitting up to six hours and standing/walking up to two hours in an eight-hour workday and of lifting/carrying up to ten pounds occasionally.

6. The claimant has failed to sustain her burden of proving that she was prevented by any impairments from performing past relevant, sedentary work as a secretary or typist on or prior to September 30, 1993.

7. The claimant was not disabled under Title II of the Social Security Act at any time commencing on or before the expiration of her insured status on September 30, 1993.

*Id.* at 4–5.

On March 2, 2001, the Appeals Counsel denied the plaintiff's request for review of the ALJ's decision of May 5, 1998. On April 26, 2001, the plaintiff filed a complaint with this Court against the Commissioner alleging that she was entitled to

disability insurance benefits arising out of her disabilities, namely cervical and thoracic syringomyelia, two small herniated discs in her back and a left ankle injury.

Presently before the Court is a motion by the Commissioner for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure. The plaintiff has not submitted any opposition papers to this motion.

## II. DISCUSSION

### A. The Legal Standard

This Court reviews the Commissioner's decision to determine whether: (1) the Commissioner applied the correct legal standard, *see Tejada v. Apfel*, 167 F.3d 770, 773 (2d Cir.1999); and (2) the decision is supported by substantial evidence, *see* 42 U.S.C. § 405(g); *Brown v. Apfel*, 174 F.3d 59, 61–62 (2d Cir.1999). Substantial evidence is "more than a mere scintilla." *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229, 59 S.Ct. 206, 83 L.Ed. 126 (1938)). It means " 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.' " *Brown*, 174 F.3d at 62–63. "To determine whether the findings are supported by substantial evidence, the reviewing court is required to examine the entire record, including contradictory evidence and evidence from which conflicting inferences can be drawn." *Id.* at 62 (quoting *Mongeur v. Heckler*, 722 F.2d 1033, 1038 (2d Cir. 1983) *(per curiam* )). The Court also must "keep[ ] in mind that it is up to the agency, and not this court, to weigh the conflicting evidence in the record." *Clark v. Commissioner of Social Security*, 143 F.3d 115, 118 (2d Cir.1998). Indeed, in evaluating the evidence, "the court may not substitute its own judgment for that of the Secretary, even if it might justifiably have reached a different result upon de novo review." *Jones v. Sullivan*, 949 F.2d 57, 59 (2d Cir.1991) (quoting *Valente v. Secretary of Health & Human Servs.*, 733 F.2d 1037, 1041 (2d Cir.1984)).

### B. The Availability of Benefits

Federal disability insurance benefits are available to those individuals who are "disabled" within the meaning of the Act. *See* 42 U.S.C. § 423(a), (d). To be eligible for disability benefits under the Act, the plaintiff must establish her "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment . . . which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The impairment must be of "such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A).

The Commissioner has promulgated a five-step analysis for evaluating disability claims. *See* 20 C.F.R. §§ 404.1520, 416.920. The Second Circuit has explained:

First, the [Commissioner] considers whether the claimant is currently engaged in substantial gainful activity. If he is not, the [Commissioner] next considers whether the claimant has a "severe impairment" which significantly limits his physical or mental ability to do basic work activities. If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which is listed in Appendix 1 of the Regulations. If the claimant has such an impairment, the [Commissioner] will consider him disabled without consider-

ing vocational factors such as age, education, and work experience; the [Commissioner] presumes that a claimant who is afflicted with a "listed" impairment is unable to perform substantial gainful activity. Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, he has the residual functional capacity to perform his .past work. Finally, if the claimant is unable to perform his past work, the [Commissioner] then determines whether there is other work which the claimant could perform.

*DeChirico v. Callahan,* 134 F.3d 1177, 1179–80 (2d Cir.1998) (quoting *Berry v. Schweiker,* 675 F.2d 464, 467 (2d Cir. 1982)); *see also Balsamo v. Chater,* 142 F.3d 75, 79–80 (2d Cir.1998); *Schaal v. Apfel,* 134 F.3d 496, 501 (2d Cir.1998). The claimant bears the burden of proof as to the first four steps, while the Commissioner bears the burden of proof as to the fifth step. *See Schaal,* 134 F.3d at 501 (citing *Perez v. Chater,* 77 F.3d 41, 46 (2d Cir.1996); 20 C.F.R. §§ 404.1520, 416.920).

To meet his burden of proof on the fifth step, the Commissioner may rely on the medical vocational guidelines contained in 20 C.F.R. Part 404, Subpart P, App. 2, commonly referred to as "the grids." The grids take into account the claimant's residual functional capacity in conjunction with the claimant's age, education and work experience. Based on these factors, the grids indicate whether the claimant can engage in any other substantial gainful work which exists in the national economy. Generally the result listed in the grids is dispositive on the issue of disability. However, the grids are not dispositive where they do not accurately represent a claimant's limitations that significantly diminish her capacity to work. *Rodriguez v. Apfel,* 1998 WL 150981 (S.D.N.Y.1998) (citations omitted). There are five levels of exertion which are derived from the grids: sedentary, light, medium, heavy, and very heavy. *See* 20 C.F.R. Pt. 404, Subpt. P, App. 2, §§ 200.00–204.00. These criteria are used to determine what level of exertion a claimant is capable of performing in an occupational setting.

Proceeding through the five-step analysis, the Commissioner must consider the complete record, including any objective medical evidence, as well as the claimant's subjective statements concerning her or his impairments, restrictions, daily activities and any other relevant statements. *See Bluvband v. Heckler,* 730 F.2d 886, 891 (2d Cir.1984). However, and significantly, the Commissioner must accord special evidentiary weight to the opinion of the treating physician. *See Clark v. Commissioner of Soc. Sec.,* 143 F.3d 115, 119 (2d Cir. 1998). The "treating physician rule," as it is known, "mandates that the medical opinion of a claimant's treating physician is given controlling weight if it is well supported by the medical findings and not inconsistent with other substantial record evidence." *Shaw v. Chater,* 221 F.3d 126, 134 (2d Cir.2000); *see Rosa v. Callahan,* 168 F.3d 72, 79 (2d Cir.1999); *Clark,* 143 F.3d at 119; *Schisler v. Sullivan,* 3 F.3d 563, 567 (2d Cir.1993). The rule, as set forth in the regulations, provides:

> Generally, we give more weight to opinions by your treating sources.... If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other. substantial evidence in your case record, we will give it controlling weight.

20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2). In analyzing a treating physician's report, "the ALJ cannot arbitrarily substitute his

own judgment for competent medical opinion." *Rosa*, 168 F.3d at 79; *see Balsamo v. Chater*, 142 F.3d 75, 81 (2d Cir.1998). If the opinion of the treating physician as to the nature and severity of the impairment is not given controlling weight, the Commissioner applies various factors to decide how much weight to give the opinion. *See Shaw*, 221 F.3d at 134; *Clark*, 143 F.3d at 118. Those factors include: (i) the frequency of examination and the length, nature, and extent of the treatment relationship; (ii) the evidence in support of the opinion; (iii) the opinion's consistency with the record as a whole; (iv) whether the opinion is from a specialist; and (v) other relevant factors. 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2); *see Clark*, 143 F.3d at 118. When the Commissioner chooses not to give the treating physician's opinion controlling weight, she or he must "give good reasons in [its] notice of determination or decision for the weight [it] gives [claimant's] treating source's opinion." *Clark*, 143 F.3d at 118 (quoting C.F.R. §§ 404.1527(d)(2); 416.927(d)(2)).

## C. The ALJ Adhered to the Sequential Evaluation

In this case, the ALJ adhered to the regulatory five-step sequential evaluation. First, the ALJ found that the plaintiff met the special insured status requirements of the Act from February 25, 1991 until September 30, 1993 and that the plaintiff had not engaged in substantial gainful activity since February 25, 1991. Second, the ALJ found that the medical evidence established that on or prior to September 30, 1993, the plaintiff had an impairment as a result of her syringomyelia of the cervical and possibly thoracic spine and two small herniated discs in the lumbosacral spine.

Third, the ALJ found that the plaintiff's impairment did not. met or equal in severity the clinical criteria of any impairment listed in 20 C.F.R. Part 404, Subpart P,

App. 1. Fourth, the ALJ evaluated the plaintiff's residual functional capacity and found that on or prior to September 30, 1993, she remained capable of performing work that involved sitting up to six hours, standing/walking up to two hours in an eight-hour workday and lifting/carrying up to ten pounds occasionally. As such, the ALJ concluded that on or prior to September 30, 1993, the plaintiff was capable of performing past relevant, sedentary work as a secretary/typist. Accordingly, the ALJ applied the correct legal standard.

## D. The ALJ's Finding is Supported by Substantial Evidence

The medical evidence and the opinions in the records offer substantial support for the ALJ's residual functional capacity finding that on or before September 30, 1993, the plaintiff was capable of performing relevant, sedentary work as a secretary/typist. "Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools." 20 C.F.R. § 404.1567(a). Generally, secretarial work is classified as sedentary work. *See* U.S. Dep't of Labor Dictionary of Occupational Titles, § 201.362–030 (4th ed.1991). The ALJ is solely responsible for deciding a plaintiff's residual functional capacity. 20 C.F.R. § 404.1546.

Dr. Mortati, the plaintiff's treating neurologist, suggested that the plaintiff was capable of sedentary work as a secretary/typist. In September of 1989, Dr. Mortati noted that the plaintiff's muscle strength and tone were intact and within normal limits, and that she had no skeletal deformities. On January 29, 1991, Dr. Mortati stated that the cervical syrinx was unchanged in size; the plaintiff had good but slightly incomplete range of motion of her cervical spine; and the strength in her extremities was within normal limits. On

February 6, 1991, Dr. Mortati noted that a Nerve Conduction Study revealed that the plaintiff's syringomyelia was asymptomatic. Further, the Electromyography was unremarkable and her tendon reflexes were symmetrically active. On July 13, 1993, Dr. Mortati reported that the plaintiff's condition had not changed since her last visit in February of 1991 more than two years before. The plaintiff noted, at that time, that her lower back pain was present only to a minimal degree and she no longer had any numbness in the left 4th and 5th finger. Also, her motor, reflex and sensory nerves were intact. Significantly, Dr. Mortati diagnosed the plaintiff with asymptomatic cervical and possible thoracic syringomyelia.

In September of 1993, the plaintiff was 31 years old. Dr. Mortati's diagnosis of the plaintiff's syringomyelia condition as being asymptomatic in July of 1993 is persuasive evidence that the plaintiff was capable of performing sedentary work as a secretary/typist. Dr. Mortati's records indicate that the plaintiff was capable of, at a minimum, lifting items weighing 10 pounds or less and occasionally lifting or carrying articles like docket files, ledgers, and small tools, especially in light of her young age.

In addition, the records of Dr. Mortati provide the most reliable evidence of the plaintiff's condition as of September 30, 1993 because he was the plaintiff's treating physician from 1989 to July 13, 1993. Except for Dr. Stewart who treated the plaintiff for lower back problems in 1989 and made no finding that the plaintiff was unable to do sedentary work, Dr. Mortati was the only physician who reported on her condition prior to and in 1993. The remaining doctors examined the plaintiff well after September 30, 1993. As such, the treating physician rule was observed and the ALJ gave proper weigh to Dr. Mortati's findings. *See Clark v. Commis-*

*sioner of Soc. Sec.,* 143 F.3d 115, 119 (2d Cir.1998) (stating that the Commissioner must accord special evidentiary weight to the opinion of the treating physician).

Moreover, the physicians who reported on her condition subsequent to September 30, 1993 and said that she was "totally disabled" did so only at the time of their examination, a period of time well after September 30, 1993. None of the doctors opined that the plaintiff was "totally disabled" for any period of time prior to their examinations or prior to September 30, 1993. As such, their reports are of limited value to whether the plaintiff was "totally disabled" on or before September 30, 1993.

Based upon the foregoing, the Court finds that the medical evidence and the opinions in the records offer substantial support for the ALJ's residual functional capacity finding that, on or before September 30, 1993, the plaintiff was capable of performing relevant, sedentary work as a secretary/typist. As such, substantial evidence exists that the plaintiff was not "disabled" prior to September 30, 1993. Accordingly, the motion to dismiss the complaint is granted.

### III. CONCLUSION

Based upon the foregoing, it is hereby

**ORDERED**, that the Commissioner's motion for judgment on the pleadings pursuant to Rule 12(c) is **GRANTED**; and it is further

**ORDERED**, that the complaint is dismissed; and it is further

**ORDERED**, that the Clerk of the Court is directed to close this case.

**SO ORDERED.**