**Teresa ALCANTARA, Plaintiff,**

v.

**Michael J. ASTRUE, Commissioner of Social Security, Defendant.**

**No. 06 Civ. 13438(RJS)(FM).**

United States District Court, S.D. New York.

Oct. 21, 2009.

Christopher James Bowes, Shoreham, NY, for Plaintiff.

Susan D. Baird, U.S. Attorney's Office, New York, NY, for Defendant.

## ORDER ADOPTING REPORT AND RECOMMENDATION

RICHARD J. SULLIVAN, District Judge:

On November 22, 2006, Plaintiff Teresa Alcantara commenced this suit against Defendant Michael J. Astrue, in his capacity as the Commissioner of Social Security.[1] (Doc. No. 1.) Pursuant to 42 U.S.C. § 405(g), Plaintiff seeks review of the Commissioner's denial of her application for disability insurance benefits. The case was originally assigned to the Honorable Kenneth M. Karas, United States District Judge, who granted Defendant's request for an extension of time to submit an answer. (Doc. No. 2.) Defendant filed his Answer on March 30, 2007. (Doc. No. 3.) On September 4, 2007, this case was reassigned from Judge Karas to the undersigned. (Doc. No. 6.) The parties then submitted cross-motions for judgments on

---

1. Although the case was originally brought against Jo Ann B. Barnhart, Mr. Astrue's predecessor as Commissioner, Mr. Astrue's name is substituted for hers automatically under Federal Rule of Civil Procedure 25(d).

the pleadings (Doc. No. 10; Doc. No. 14), which the Court referred to the Honorable Frank Maas, United States Magistrate Judge, for a Report and Recommendation (Doc. No. 15).

On September 25, 2009, Judge Maas issued a Report and Recommendation recommending that Plaintiff's motion be granted in part, Defendant's motion be denied, and that the case be remanded for further proceedings. (Doc. No. 16.) In the Report and Recommendation, Judge Maas advised the parties that failure to file timely objections within ten days from service of the Report would constitute a waiver of those objections. *See* 28 U.S.C. § 636(b)(1)(C); Fed.R.Civ.P. 72(b). No party has filed objections to the Report, and the time to do so has expired. *Cf. Frank v. Johnson*, 968 F.2d 298 (2d Cir. 1992).

When no objections to a Report and Recommendation are made, the Court may adopt the Report if there is no clear error on the face of the record. *Adee Motor Cars, LLC v. Amato*, 388 F.Supp.2d 250, 253 (S.D.N.Y.2005); *La Torres v. Walker*, 216 F.Supp.2d 157, 159 (S.D.N.Y. 2000). After conducting a review of the record, the Court finds that Judge Maas's thorough Report and Recommendation is not facially erroneous. Accordingly, the Court adopts the Report and Recommendation in its entirety. For the reasons set forth in the Report and Recommendation, the Court grants in part Plaintiffs motion for judgment on the pleadings, denies Defendant's motion for judgment on the pleadings, and remands the case to the Administrative Law Judge to provide a more detailed discussion of her credibility findings after considering the factors set forth in 20 C.F.R. § 404.1529(c)(3). The Clerk of the Court is respectfully directed to close the case.

SO ORDERED.

### REPORT AND RECOMMENDATION TO THE HONORABLE RICHARD J. SULLIVAN

FRANK MAAS, United States Magistrate Judge.

Plaintiff Teresa Alcantara ("Alcantara") brings this action pursuant to Section 205(g) of the Social Security Act ("Act"), 42 U.S.C. § 405(g), seeking review of a final decision of the Commissioner of the Social Security Administration ("Commissioner") denying her application for disability insurance benefits. Alcantara has moved, and the Commissioner has cross-moved, for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure ("Rule 12(c)"). For the reasons set forth below, I recommend that (a) Alcantara's motion be granted in part, (b) the Commissioner's motion be denied, and (c) the case be remanded for further consideration of the credibility of Alcantara's complaints regarding her symptoms.

### I. *Background*

#### A. *Procedural History*

On November 6, 2003, Alcantara filed an application for disability insurance benefits, alleging that her disability began on February 15, 2002. (*See* Tr. 50–50A).[1] Alcantara claimed that she was disabled because her diabetes, hypertension, and arthritis caused her to suffer from headaches, dizzy spells, and pain in the knees that rendered her unable to work. (*Id.* at 28, 62). After the Social Security Administration ("SSA") denied Alcantara's appli-

---

1. Citations to "Tr." refer to the certified copy of the administrative record filed with the Answer. (Docket No. 4).

cation based on a state agency review, she requested a *de novo* hearing before an administrative law judge ("ALJ"). (*Id.* at 25, 28–29).

ALJ Suanne S. Strauss subsequently held a hearing on November 8, 2005, at which Alcantara was represented by James Christopher Bowes, Esq., the same attorney who represents her before this Court. (*Id.* at 186–208). The ALJ then issued a decision on January 27, 2006, in which she concluded that Alcantara was not disabled within the meaning of the Act before December 31, 2004, the date when her disability benefits expired. (*Id.* at 12–17, 52). This decision became final on August 10, 2006, when the Appeals Council denied Alcantara's request for review. (*Id.* at 3–5).

Alcantara timely commenced this action on November 22, 2006. (Docket No. 1). The Commissioner filed his answer on March 30, 2007. (Docket No. 4). On October 22, 2007, Alcantara filed a motion for judgment on the pleadings pursuant to Rule 12(c). (Docket No. 10). The Commissioner filed a cross-motion for judgment on the pleadings on January 7, 2008. (Docket No. 14). On February 3, 2009, Your Honor referred the case to me for a Report and Recommendation. (Docket No. 15).

The issue presented by both motions is whether the ALJ's determination that Alcantara was not disabled within the meaning of the Act is legally correct and supported by substantial evidence.

## II. *Relevant Facts*

### A. *Nonmedical Evidence*

Alcantara was born on April 7, 1945, in Ecuador, where she attended school through the second grade. (Tr. 50, 65, 191). She moved to the United States in 1976 but is not a citizen. (*Id.* at 191). She was fifty-six years old on February 15, 2002, the alleged onset date of disability, and sixty years old at the time of the hearing before ALJ Strauss.

Alcantara does not speak English and testified through an interpreter. (*Id.* at 188). At the time of the hearing, she lived in an apartment with her husband. (*Id.* at 194). Alcantara testified that they have children who are grown and married; she also has grandchildren but does not babysit for them. (*Id.* at 194–95).

Between 1976 and 2001, Alcantara worked as a seamstress for a number of different employers. (*Id.* at 62–63, 191). She testified that this work required her to operate a sewing machine using her hands and feet and occasionally to lift and carry packages of clothing weighing ten pounds or less. (*Id.* at 63, 192). These seamstress jobs did not require her to reach across her table, because everything she needed to perform her duties was placed nearby. (*Id.* at 201).

In 2000, Alcantara switched from a full- to a part-time schedule. (*Id.* at 195). After the terrorist attacks of September 11, 2001, she stopped working altogether. (*Id.*). Alcantara explained that she later attempted to return to work, but the last company for which she worked had moved from its former location. (*Id.*). She testified that her subsequent efforts to obtain full-time employment were unsuccessful, and that she no longer could work because of the effects of her diabetes, arthritis, and hypertension. (*Id.* at 190, 192, 195).

Vocational expert Richard Baine also testified at the hearing. (*Id.* at 206). Baine classified Alcantara's past relevant work as "sewing-machine operator," a "semiskilled" occupation requiring the use of foot controls, which therefore is considered "light exertion." (*Id.* at 206–07).

B. *Medical Evidence*

1. *Physician Records*

a. *Treating Physicians' Records*

In the eighteen months preceding her alleged onset of disability in February 2002, Alcantara was evaluated by physicians numerous times. During a visit on October 6, 2000, Alcantara complained of chest congestion, numbness in her lower extremities, shortness of breath after walking two to three blocks, and paresthesia.[2] (*Id.* at 97, 101). Her blood pressure was 140/90,[3] and her glucose level was 314.[4] (*Id.* at 97, 99). The following month, on November 28, 2000, Alcantara's blood pressure was 130/80. (*Id.* at 102). On both occasions, her treating physician diagnosed noninsulin-dependent diabetes mellitus ("NIDDM") with neuropathy.[5] (*Id.* at 101–02).

In 2001, Alcantara was evaluated four times by her treating physician. (*Id.* at 103–04, 112, 118). During the first visit, on August 31, 2001, Alcantara complained of a wound to the right ankle and admitted that she had not taken the Glucotrol prescribed for her diabetes for six months. (*Id.* at 103). Her treating physician described the wound as erythematous[6] and found cellulitis[7] in Alcantara's left ankle.

(*Id.*). Approximately one month later, on September 28, 2001, Alcantara complained of a cough and congestion in her right nasal passage over the past three days. (*Id.* at 104). Her blood pressure was 130/70. (*Id.*). On October 19, 2001, Alcantara complained that she had been experiencing pain in her right ankle for three weeks. (*Id.* at 112). On examination, her physician recorded her blood pressure as 140/80 and determined that a lesion on her right ankle was the source of the pain. (*Id.*). During her final visit of the year on December 12, 2001, Alcantara reported a tingling sensation in both legs persisting for one week. (*Id.* at 118). The physician noted that her blood pressure was 120/70 and that all body systems were normal, but he diagnosed peripheral neuropathy. (*Id.*).

In January 2002, approximately one month before her alleged onset date, Alcantara started seeing Dr. Bienvenido Fajardo, who served as her treating physician throughout the period at issue. During a visit on January 16, 2002, Alcantara complained of a headache that had persisted for two days. (*Id.* at 119). Alcantara's blood pressure was 130/80. (*Id.*). Dr. Fajardo found some tender-

---

2. Paresthesia is "an abnormal sensation, such as of burning, pricking, tickling, or tingling." *Stedman's Medical Dictionary* (27th ed. 2000) [hereinafter *Stedman's*].

3. A blood pressure reading consists of the systolic pressure, the pressure of blood pushing against the arteries when the heart beats, and the diastolic pressure, the pressure against the arteries when the heart is at rest. The numbers are usually presented as the systolic over the diastolic pressure. A reading of 140/90 or higher is considered high blood pressure, while a reading of 120/80 or lower is considered normal. *See, e.g.,* High Blood Pressure, Medline Plus Health Topics, http://www.nlm.nih.gov/medlineplus/highblood pressure.html (last visited Sept. 14, 2009).

4. In general, glucose levels up to 100 mg/dL are considered normal. Glucose Test, Medline Plus Health Topics, http://www.nlm.nih.gov/medlineplus/ency/article/003482.htm (last visited Sept. 14, 2009).

5. Neuropathy is "a disease involving the cranial nerves or the peripheral or autonomic nervous system." Neuropathy affecting either the peripheral or autonomic nervous system is the most common diabetic complication. *Stedman's.*

6. Erythema is "redness due to capillary dilation." *Stedman's.*

7. Cellulitis is an "inflammation of subcutaneous, loose connective tissue." *Stedman's.*

ness of the temporal muscle although he noted that all body systems were normal. (*Id.*). The doctor also diagnosed hypertension. (*Id.*).

During a visit on March 15, 2002, one month after her alleged disability onset, Alcantara reported pain in both legs. (*Id.* at 120). Dr. Fajardo noted that there was no swelling of the calf and directed her to take Tylenol for the pain. (*Id.* at 120). The following month, on April 8, 2002, Alcantara informed Dr. Fajardo that she had been experiencing dizziness for two weeks. (*Id.* at 121). He determined that all her body systems were normal, but that she was suffering from vertigo, for which he prescribed Antivert.[8] (*Id.* at 121).

During all three of Alcantara's visits in early 2002, Dr. Fajardo diagnosed her as suffering from NIDDM and hyperlipidemia.[9] (*Id.* at 119–21). During the latter two visits, Dr. Fajardo recorded her blood pressure, respectively, as 110/70 and 140/80. (*Id.* at 120–21).

On June 14, 2002, Alcantara visited Dr. Fajardo for an evaluation of her diabetes.

(*Id.* at 136). On that date, her blood pressure was 130/80, and she informed Dr. Fajardo that she had not been taking her medications for three days. (*Id.*). Dr. Fajardo found that all body systems were normal, but diagnosed NIDDM, hyperlipidemia, and proteinuria.[10] (*Id.*). A test of her glycohemoglobin A1C [11] that month indicated a level that put her at high risk of developing long-term diabetic complications, but by December 14, 2002, the same test indicated that she fell into the "good" range. (*Id.* at 122–23).

Alcantara visited Dr. Fajardo on three additional occasions in 2002. (*Id.* at 124–26). On August 14, Alcantara reported "epigastritis pain" persisting for three days. (*Id.* at 124). Dr. Fajardo diagnosed gastritis [12] and noted continuing proteinuria, NIDDM, and hyperlipidemia, but found that all her body systems were normal. (*Id.*). Several months later, on October 22, Alcantara reported a cyst and boils on her right buttock and thigh. (*Id.* at 125). Dr. Fajardo found that all her body systems were normal but diagnosed folliculitis.[13] (*Id.*). In her final visit of the year

8. Antivert is used "to reduce lightheadedness, dizziness, and loss of balance (vertigo) caused by diseases that affect the inner ear." WebMD, Antivert, http://www.webmd.com/drugs/drug5337–Antivert+Oral.aspx?drugid=5337&drugname=Antivert+Oral (last visited Sept. 22, 2009).

9. Hyperlipidemia refers to "[e]levated levels of lipids in the blood plasma." *Stedman's*.

10. Proteinuria is the "presence of urinary protein in amounts greater than .3g in a 24–hour urine collection or in concentrations greater than 1 g/L (1+ to 2+ by standard turbidometric methods) in a random urine collection on two or more occasions at least 6 hours apart." *Stedman's*. This is often indicative of kidney damage resulting from diabetes or hypertension. *See also* Proteinuria, National Kidney and Urologic Diseases Information Clearinghouse, http://kidney.niddk.nih.gov/kudiseases/pubs/proteinuria/ (last visited Sept. 14, 2009).

11. Glycohemoglobin is a test that measures the amount of glycated hemoglobin in the blood. "Glycated hemoglobin is a substance in red blood cells that is formed when blood sugar (glucose) attaches to hemoglobin." The test provides a measure of blood sugar control over the two to three preceding months. A level of six percent or less is normal; a diabetic should strive for a level below seven percent. *See* HbA1c, Medline Plus Medical Encyclopedia, http://www.nlm.nih.gov/medlineplus/ency/article/003640.htm (last visited Sept. 14, 2009).

12. Gastritis is an "inflammation, especially mucosal, of the stomach." *Stedman's*.

13. Folliculitis is "an inflammatory reaction in hair follicles; the lesions may be papules [a circumscribed, solid elevation up to 100 cm in diameter on the skin] or pustules [a circumscribed, superficial elevation of the skin, up to one cm in diameter]." *Stedman's*.

on December 17, Alcantara complained of pain in her lower back persisting for one week. (*Id.* at 126). She admitted that she had not been taking Altace, the medication prescribed to manage her blood pressure. (*Id.*). On physical examination, Dr. Fajardo found that all her body systems were normal, with the exception of her lower back on flexion and extension. (*Id.*). During these visits, Alcantara's blood pressure was 140/80, 130/80, and 150/90, respectively. (*Id.* at 124–126).

In 2003, Alcantara continued seeing Dr. Fajardo for routine evaluations of her diabetes and hypertension, (*id.* at 127, 137, 143), as well as for treatment of specific ailments, (*id.* at 128, 139, 144). At the first routine evaluation on April 8, 2003, her blood pressure was 150/90. (*Id.* at 127). On the dates of her next two evaluations, her blood pressure was 140/90. (*Id.* at 128, 137). Although Dr. Fajardo recorded the results of a glycohemoglobin test only on his notes of the visit on April 8, the test indicated that she was in the "good range," with a level of 8.4. (*Id.* at 127). On December 4, 2003, Alcantara informed Dr. Fajardo that she had run out of her medications several weeks earlier. (*Id.* at 143). Dr. Fajardo noted that her left foot was "mildly swollen," and an x-ray dated December 5, 2003, revealed diffuse osteoporosis [14] in that foot. (*Id.* at 140–41, 43, 145). During each of these visits, except as otherwise noted, Dr. Fajardo indicated that all of Alcantara's body systems were normal. (*Id.* at 127, 137, 143).

On July 9, 2003, Alcantara complained of headaches over the three-day period preceding her appointment. (*Id.* at 128). Dr. Fajardo found that her body systems were normal, but diagnosed migraine headaches and instructed her to take Tylenol. (*Id.*). Several months later, on October 7, 2003, Alcantara complained to Dr. Fajardo that the skin on her nose had been black for a month. (*Id.* at 139). Dr. Fajardo diagnosed this as hypopigmentation, but otherwise found that all her body systems were normal. (*Id.*). On these dates, her blood pressure was 140/90 and 120/80, respectively. (*Id.* at 128, 139).

At the end of 2003, Alcantara was evaluated at the emergency room at St. Luke's–Roosevelt Hospital Center because the left side of her face was drooping. (*Id.* at 80–85). The emergency room physician's diagnosis was Bell's palsy.[15] (*Id.* at 85). Alcantara was discharged the same day in a "pain-free" and "stable" condition. (*Id.* at 83). Four days later, Dr. Fajardo confirmed the diagnosis of facial palsy, but found that her body systems were otherwise normal, and recorded her blood pressure as 140/90. (*Id.* at 144).

In January and March 2004, Alcantara visited Dr. Fajardo complaining of a persistent cough. (*Id.* at 152–53). On both occasions, her blood pressure was 130/80. (*Id.*). On April 15, 2004, Alcantara returned to Dr. Fajardo for an evaluation of her cholesterol, diabetes, and hypertension. (*Id.* at 154). She reported feeling better, but her blood pressure had risen to 140/80. (*Id.*). Later that year, on July 15,

14. Osteoporosis is the "reduction in quantity of bone or atrophy of skeletal tissue; an age related disorder characterized by decreased bone mass and increased susceptibility to fractures." *Stedman's*.

15. Bell's palsy is a paresis or paralysis, usually unilateral, of the facial muscles. *Stedman's*. Symptoms range from weakness of the face to total paralysis. The prognosis is

generally very good, and the extent of recovery depends on the extent of the damage to the nerves. Most patients recover completely within three to six months. *See, e.g.*, Bell's Palsy, National Institute of Neurological Disorders and Stroke, http://www.ninds.nih.gov/disorders/bells/bells.htm (last visited Sept. 14, 2009).

2004, Alcantara again was evaluated for her cholesterol and hypertension. (*Id.* at 156). During this visit, her blood pressure was 140/70. (*Id.*). In each of these visits during 2004, Dr. Fajardo noted that Alcantara's body systems were normal (with the exception of "ENT" and "Chest/Breast" on the dates she complained of a cough). (*Id.* at 152–54, 156).

On September 16, 2004, Alcantara visited Dr. Fajardo for the evaluation of a rash on her chest that had persisted for two weeks. (*Id.* at 158). Dr. Fajardo recorded her blood pressure as 140/80 and noted that with the exception of the rash all her body systems were normal. (*Id.*).

An October 27 radiological exam of Alcantara's upper gastrointestinal tract requested by Dr. Fajardo disclosed prominent "area gastricae"[16] with possible regions of erosions/ulceration, suggestive of gastritis. (*Id.* at 147). Additionally, the exam revealed tertiary esophageal contractions[17] and calcifications which may have represented calcific bursitis.[18] (*Id.*).

On December 16, 2004, Alcantara again was evaluated by Dr. Fajardo for hypertension and diabetes. (*Id.* at 159). She reported feeling well and was asymptomatic. (*Id.*). Her blood pressure was 160/80, and her glycohemoglobin A 1C level was 6.9. (*See id.*). Dr. Fajardo noted that all her body systems were normal. (*Id.*).

On May 31, 2005, Alcantara was evaluated at the New York–Presbyterian emergency room for a throbbing headache. (*Id.* at 176–77). A CT scan revealed no evidence of hemorrhage or skull fracture. (*Id.* at 184).

Alcantara's application for disability insurance benefits indicated, and Dr. Fajardo's records confirmed, that at the time of her application, Alcantara was taking daily doses of 500 mg of acetaminophen for pain, 2.5 mg of Altace and 10 mg of Lipitor for high blood pressure, and 4 mg of Avandia and 10 mg of Glucotrol for diabetes. (*Id.* at 64–65). All of these medications were prescribed by Dr. Fajardo. (*Id.*).

b. *Dr. Antonio De Leon–Consulting Physican*

On December 8, 2003, Alcantara was examined by Dr. Antonio De Leon, of Diagnostic Health Services, in connection with her Social Security Disability Insurance claim. (*Id.* at 86–89).

Alcantara reported to Dr. De Leon that she had been suffering from hypertension for four years. (*Id.* at 86). She stated that she took one Altace pill daily to manage her blood pressure, which had reached 200 at its highest level. (*Id.*). Alcantara further reported that she had diabetes, which she managed with Glucotrol and Avandia, for "a long time." (*Id.*). She said that, at its height, her blood sugar level had reached 329, but that it was 193 the previous day. (*Id.*). She also indicat-

---

**16.** An area (or "areae") gastricae is a "fine reticular network of interlacing lines visible in 50–70% of patients on double contrast barium study of the stomach." This pattern may be indicative of gastritis. *See, e.g.,* Medcyclopedia–Areae gastricae, http://www.med cyclopaedia.com/library/topics/volume_iv_1/a/areae_gastricae.aspx (last visited Sept. 15, 2009).

**17.** Tertiary esophageal contractions involve the disordered up-and-down movement of a bolus in the distal 2/3 of the esophagus. *See,*

*e.g.,* Tertiary Esophageal Contractions, Collaborative Hypertext of Radiology, http://chorus.rad.mcw.edu/doc/00865.html (last visited Sept. 14, 2009).

**18.** Calcific bursitis is the "inflammation of a bursa [a sac containing fluid, usually found in areas subject to friction] that results in the deposition of calcium salts; most commonly associated with subdeltoid bursitis." *Stedman's.*

ed that her diabetes caused her to suffer from polyuria[19] and polydipsia.[20] (*Id.*).

Alcantara informed Dr. De Leon that she also had arthritis, which particularly affected her left knee and made it painful for her to walk. (*Id.*). She said that she was able to walk only two blocks, that her husband assisted her with shopping and cooking, and that she spent her days watching television. (*Id.*).

Finally, Alcantara advised Dr. De Leon that she recently had been diagnosed with Bell's palsy, had an infection in the nail of her fourth toe on her left foot, and had elevated cholesterol for which she took Lipitor. (*Id.*).

During his examination, Dr. De Leon recorded Alcantara's blood pressure as 130/80. (*Id.*). He found that she walked with a slight limp and had some "minor difficulty" moving off the exam table from a seated position. (*Id.* at 87). Although Alcantara had some slight swelling in her knee, Dr. De Leon indicated that she had full range of motion and was able to tandem walk.[21](*Id.*). Alcantara also was able to walk without difficulty on her heels, but had slight trouble doing so on the balls of her feet. (*Id.*). Bending forward at the waist, she could flex to sixty degrees.

(*Id.*). She also could perform a straight leg raise to sixty degrees. (*Id.*).

Dr. De Leon's diagnosis was "hypertension, controlled; diabetes mellitus, Type II with background retinopathy;[22] hyperlipidemia; arthritis [in her] knee; and Bell's palsy." (*Id.*) In light of these conditions, he concluded with respect to her work-related activities that Alcantara could sit without limitation; that her walking and standing were mildly limited by hypertension, diabetes, and arthralgia[23] in her knee; and that her carrying and lifting also were mildly limited for the same reasons. (*Id.* at 87). He recommended that she continue to see her treating physician. (*Id.*).

Dr. De Leon also requested x-rays of Alcantara's right knee and back, which were taken on December 9, 2003.[24] (*Id.* at 87–88). The results of the knee scan showed no evidence of acute fracture, dislocation, or destructive bony lesion. (*Id.* at 88). The radiologist also concluded that the joint spaces were "relatively well maintained." (*Id.*). Similarly, a scan of Alcantara's lumbosacral spine on December 30, 2003, revealed that the intervertebral disc

---

19. Polyuria is "the excessive excretion of urine resulting in profuse and frequent micturition" (the desire to urinate). *Stedman's.*

20. Polydipsia is "excessive thirst that is prolonged." *Stedman's.*

21. A tandem walking test requires a patient to walk heel to toe in a straight line. Difficulties performing this task reflect the extent to which balance, strength, coordination, and range of motion are impaired. *See, e.g.,* Balance Training, http://www.memorialhospital.org/BalanceTraining.htm (last visited Sept. 14, 2009), *and* Tandem Walk, NeuroCom International, http://resourcesonbalance.com/neurocom/protocols/functionalLimitation/tw.aspx (last visited Sept. 14, 2009).

22. Diabetic retinopathy consists of changes to the retina marked by microaneurysms (dilation of retinal capillaries), exudates (fluid that has exuded out of tissue or its capillaries because of injury or inflammation), hemorrhages (escape of blood from intravascular space), and sometimes neovascularization (proliferation of blood vessels in tissue not normally containing them). *Stedman's.*

23. Arthralgia is defined as pain in the joint, especially one not inflammatory in character. *Stedman's.*

24. As Alcantara correctly notes, it is unclear why Dr. De Leon indicated that she reported pain principally in her left knee but ordered x-rays of her right knee. (*See* Pet'r's Mem. at 10).

spaces were "relatively well maintained." (*Id.* at 89).

### 2. *Alcantara's Testimony*

Alcantara testified at the hearing that she was unable to work because of continuous headaches, joint pain, and dizziness arising out of her diabetes, hypertension, and arthritis. (*Id.* at 62, 192, 195, 198–99). She further stated that she had learned of her diabetes fifteen years earlier, *i.e.,* in or around 1990. (*Id.* at 191).

Alcantara described her headaches as "continuous." (*Id.* at 195). When the ALJ noted that none of her medications were for headaches, Alcantara confirmed that this was true, stating that "[the pills] are for the diabetes and ... don't help [her] whenever [she has] a headache." (*Id.* at 195–96). She explained that she treated the headaches with bed-rest and by remaining in the dark. (*Id.* at 196).

Alcantara also testified that for over a year she had been suffering from dizzy spells, each of which lasted approximately twenty minutes. (*Id.* at 199). She explained that the spells were induced by lying down or leaning forward or downward suddenly, but that the medication she was prescribed was "very good" because it alleviated the dizziness.[25] (*Id.* at 200). After taking the medication, she would "take it easy" by sitting or lying down. (*Id.*). Alcantara was unable to estimate how many times per week she experienced dizziness, but noted "it's when I just get up suddenly or I do something sudden." (*Id.*).

In addition to the headaches and dizziness, Alcantara testified that she had joint pain as a result of her diabetes. (*Id.* at 198). She stated that she was not prescribed any medication to manage this pain, which she described as affecting her "all over [her] body." (*Id.*).

### C. *ALJ Decision and Appeal*

ALJ Strauss issued a decision on January 27, 2006, in which she concluded that Alcantara was not disabled during the relevant period. (*Id.* at 17). In her decision, the ALJ first reviewed Alcantara's medical and nonmedical history, and then engaged in the five-step sequential analysis required by 20 C.F.R. § 404.1520. (*Id.* at 14–16).

At Step One, ALJ Strauss determined that Alcantara had not engaged in substantial gainful activity since the alleged onset of disability. (*Id.* at 16).

At Step Two, the ALJ noted that Alcantara was being treated for NIDDM and hypertension and had reported knee pain. (*Id.* at 14). With respect to the knee pain, ALJ Strauss cited Dr. De Leon's examination on December 8, 2003, which revealed slight swelling in the knee but a full range of motion and the ability to tandem walk. (*Id.* at 14; *see also id.* at 87). The ALJ then noted that Alcantara was evaluated in the emergency room on December 5, 2003, and diagnosed with Bell's palsy, but that this condition "apparently resolved without complication." (*Id.* at 14). The ALJ found, however, that Alcantara's NIDDM and hypertension were "severe" within the meaning of the Act. (*Id.* at 14). ALJ Strauss concluded that Alcantara's "subjective knee pain of undetermined etiology and intensity" also could be considered "severe." (*Id.*).

At Step Three of the analysis, ALJ Strauss found that these medically determinable impairments did not meet or medically equally one of the listed impairments

---

**25.** Alcantara presumably was referring to the Antivert previously prescribed by Dr. Fajardo.

(*Id.* at 121).

in Appendix 1, Subpart P, Regulation No. 4 [hereinafter Appendix 1]. (*Id.* at 16). In particular, with respect to the listing for diabetes, ALJ Strauss found that "the evidence does not establish any diabetic complications, as described in Listing 9.08." (*Id.* at 14). The ALJ recognized that Alcantara clearly suffered from "significant" background diabetic retinopathy and macular edema, but noted that the treatment records from Dr. Fajardo showed "no systemic abnormalities." (*Id.*). The ALJ also noted that in December of 2001, Alcantara had reported feeling a tingling sensation in her legs, at which time she was diagnosed with diabetic neuropathy by Dr. Fajardo, but that no further testing was ordered to confirm this diagnosis.[26] (*Id.* at 14). With regard to the condition of Alcantara's legs in general, the ALJ found that Alcantara did not meet Listing 1.02 because there was no evidence that she ever had "an MRI or other testing of her knees," or had been treated or evaluated by an orthopedic specialist. (*Id.*). Moreover, there was no evidence that Alcantara required ambulatory assistance or had any difficulty walking. (*Id.*).

At Step Four of the analysis, ALJ Strauss assessed Alcantara's residual functional capacity ("RFC") to perform the requirements of her past relevant work. (*Id.* at 15–16). The ALJ concluded in the "Findings" section of her decision that Alcantara's allegations regarding her limitations were not totally credible "for the reasons set forth in the body of the decision." (*Id.* at 16). Previously in her decision, the ALJ had concluded that the evidence failed to establish that Alcantara had stopped working or changed her work schedule because of any physical impairments or limitations; rather, she had gone "from a full time to a part-time schedule after 9/11," and had stopped working "be-cause the company closed." (*Id.*). The ALJ further determined that there was no evidence that Alcantara's headaches or joint pain were of an intensity or frequency that would prevent her from working. (*Id.*). ALJ Strauss noted in this regard that Alcantara did not take pain medication, and that a CT scan of her head did not show a significant focal intracranial lesion. (*Id.* at 15). Furthermore, citing Dr. Fajardo's records, the ALJ found that Alcantara had not complied consistently with treatment to control her diabetes and blood pressure. (*Id.*). These conditions, the ALJ stated, were "controllable with medication, and there [was] no evidence of any end-organ damage." (*Id.*). Indeed, Alcantara "ha[d] never been on insulin or hospitalized for uncontrolled diabetes" and her blood-sugar level was "usually controlled," although it exceeded 200 mg/dL four or five times per year. (*Id.*).

Giving Alcantara a "significant benefit of the doubt regarding her subjective symptoms," ALJ Strauss found that Alcantara was limited to sitting for six hours in an eight-hour workday; standing and walking for one hour at a time, for a total of four hours in an eight-hour workday; lifting or carrying ten pounds; and using foot controls. (*Id.*). Based on this assessment of Alcantara's RFC and the nature of her past relevant work, the ALJ concluded that Alcantara's medically-determinable impairments and subjective pain did not prevent her from performing her past relevant work as a sewing-machine operator. (*Id.* at 16). Accordingly, the ALJ did not continue to Step Five of the sequential analysis. (*Id.* at 16–17).

### III. *Applicable Law*

#### A. *Standard of Review*

Under Rule 12(c), judgment on the pleadings is appropriate when the material

---

**26.** This symptom also occurred prior to the alleged period.

facts are undisputed and a party is entitled to judgment as a matter of law based on the contents of the pleadings. *See, e.g., Sellers v. M.C. Floor Crafters, Inc.,* 842 F.2d 639, 642 (2d Cir.1988); *Carballo ex rel. Cortes v. Apfel,* 34 F.Supp.2d 208, 213–14 (S.D.N.Y.1999).

The Act, in turn, provides that "[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g); *see Veino v. Barnhart,* 312 F.3d 578, 586 (2d Cir.2002); *Perez v. Chater,* 77 F.3d 41, 46 (2d Cir.1996). The term "substantial" does not require that the evidence be overwhelming, but it must be "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales,* 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971) (quoting *Consol. Edison Co. v. NLRB,* 305 U.S. 197, 229, 59 S.Ct. 206, 83 L.Ed. 126 (1938)).

A court is not permitted to review the Commissioner's decision *de novo. Halloran v. Barnhart,* 362 F.3d 28, 31 (2d Cir. 2004) (citing *Schaal v. Apfel,* 134 F.3d 496, 501 (2d Cir.1998)); *Jones v. Sullivan,* 949 F.2d 57, 59 (2d Cir.1991). Rather, when the Commissioner's determination is supported by substantial evidence, the decision must be upheld. *See Alston v. Sullivan,* 904 F.2d 122, 128 (2d Cir.1990).

B. *Disability Determination*

The term "disability" is defined in the Act as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 416(i)(1)(A). In determining whether a claimant is disabled, the Com-

missioner is required to apply the five-step sequential process set forth in 20 C.F.R. § 404.1520. The Second Circuit has described that familiar process as follows:

First the [Commissioner] considers whether the claimant is currently engaged in substantial gainful activity. If he is not, the [Commissioner] next considers whether the claimant has [a] "severe impairment" which significantly limits his physical or mental ability to do basic work activities. If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which is listed in Appendix 1 of the regulations. If the claimant has such an impairment, the [Commissioner] will consider him disabled without considering vocational factors such as age, education, and work experience.... Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, he has the [RFC] to perform his past work. Finally, if the claimant is unable to perform his past work, the [Commissioner] then determines whether there is other work which the claimant could perform.

*Rosa v. Callahan,* 168 F.3d 72, 77 (2d Cir.1999) (quoting *Berry v. Schweiker,* 675 F.2d 464, 467 (2d Cir.1982)); *accord Draegert v. Barnhart,* 311 F.3d 468, 472 (2d Cir.2002).

The claimant bears the burden of proof with respect to the first four steps of the process. *DeChirico v. Callahan,* 134 F.3d 1177, 1180 (2d Cir.1998). If the Commissioner finds that a claimant is disabled (or not disabled) at an early step in the process, he is not required to proceed with any further analysis. *See* 20 C.F.R. § 404.1520(a)(4); *Williams v. Apfel,* 204 F.3d 48, 49 (2d Cir.1999). However, if the analysis reaches the fifth step of the pro-

cess, the burden shifts to the Commissioner to show that the claimant is capable of performing other work. *DeChirico,* 134 F.3d at 1180.

■ In assessing whether a claimant has a disability, the factors to be considered include: "(1) the objective medical facts; (2) diagnoses or medical opinions based on such facts; (3) subjective evidence of pain or disability testified to by the claimant or other[s]; and (4) the claimant's educational background, age, and work experience." *Rivera v. Harris,* 623 F.2d 212, 216 (2d Cir.1980) (internal citations omitted).

## IV. *Application of Facts to Law*

The issues presented by the cross-motions are whether the Commissioner correctly applied the law and whether substantial evidence exists to support his findings. Alcantara claims the Commissioner's decision was improper because the ALJ failed to consider her complaints of headaches, joint pain, and dizziness, and failed to make a proper credibility assessment. (Pet'r's Mem. at 17–24). The Commissioner disputes these assertions and maintains that substantial evidence supported the decision that Alcantara was not disabled. (Comm'r's Mem. at 9–24).

As set forth below, there is substantial evidence to support the ALJ's findings at the first three steps of the sequential evaluation At Step Four, however, the ALJ's findings are insufficient. Accordingly, the case must be remanded to permit the Commissioner to explain further his credibility determinations.

### A. *Substantial Evidence*

#### 1. *First Step*

The first step of the sequential analysis requires the ALJ to determine whether the claimant has engaged in substantial gainful activity during the period at issue. 20 C.F.R. § 404.1520(a)(4)(i).

The ALJ determined that Alcantara had not engaged in substantial gainful activity since the alleged onset of her disability. (Tr. 16). This finding benefits Alcantara and is consistent with the evidence, which indicated that Alcantara had been employed by various manufacturers, but stopped working in 2001 and reported no earnings after 2002. (*Id.* at 57–58A).

#### 2. *Second Step*

■ The second step of the sequential analysis requires the ALJ to assess the medical severity of the claimant's impairments. 20 C.F.R. § 404.1520(a)(4)(ii). An impairment is severe if it significantly limits the claimant's physical or mental ability to perform basic work activities. *Id.* § 404.1520(c).

The ALJ determined that Alcantara's hypertension, NIDDM, and knee pain were severe within the meaning of the Act. (Tr. 14, 16). Indeed, the medical record confirms that Alcantara took medication to control diabetes and hypertension and visited Dr. Fajardo frequently during the period at issue for evaluation of these problems and their sequelae. Similarly, the diagnostic impression of Dr. De Leon, the state agency's consulting physician, included controlled hypertension, type II diabetes mellitus, and arthritis of the knees, which he indicated would limit Alcantara's ability to walk and stand. (*Id.* at 87). There consequently is substantial evidence to support the ALJ's finding that Alcantara's hypertension, diabetes, and knee pain were severe within the meaning of the Act. Once again, this finding benefits Alcantara.

#### 3. *Third Step*

The third step calls for the ALJ to determine whether the claimant has an impairment listed in Appendix 1. 20 C.F.R.

§ 404.1520(a)(4)(iii). The ALJ is required to base this determination solely on medical evidence, without regard to the claimant's age, education, or work experience. *Id.* § 404.1520(d). If the ALJ finds that the claimant has an impairment that meets or equals a listing in Appendix 1, the claimant is considered disabled within the meaning of the Act. *Id.* §§ 404.1520(a)(4)(iii), (d).

The pain in Alcantara's knees must be evaluated under Section 1.02, which pertains to the "major dysfunction of a joint(s) (due to any cause)." Appendix 1 § 1.02. To meet this listing, a claimant must demonstrate involvement of one major peripheral weight-bearing joint (i.e., hip, knee, or ankle), resulting in inability to ambulate effectively, as defined in Section 1.00(B)(2)(b). *Id.* § 1.02(A).

■ The record contains sufficient evidence of Alcantara's arthritic knee pain, osteoporosis in her left foot, peripheral neuropathy, and other ailments affecting her legs to establish "involvement" of a "major peripheral weight-bearing joint." (Tr. 86–87, 118, 143, 145). As the ALJ correctly noted, however, Alcantara failed to show that this affected her ability to ambulate effectively. (*Id.* at 14).

Section 1.00(B)(2)(b) defines the inability to ambulate effectively as

> extreme limitation of the ability to walk; i.e., an impairment(s) that interferes very seriously with the individual's ability to independently initiate, sustain, or complete activities. Ineffective ambulation is defined generally as having insufficient lower extremity functioning ... to permit independent ambulation without the use of a hand-held assistive device(s) that limits the functioning of both upper extremities.

Dr. De Leon found in this regard that Alcantara walked with a slight limp and had minor difficulties moving on and off the exam table. (Tr. 87). Nevertheless, although Alcantara had trouble walking on the balls of her feet, Dr. De Leon found that she was able to walk without difficulty on her heels, had a full range of motion, and could tandem walk. (*Id.*). Dr. De Leon's overall impression therefore was that she had only a "mild limitation" of her ability to walk. (*Id.*). There is no other medical evidence indicating that Alcantara's knee pain "very seriously" affected her. Accordingly, the ALJ correctly found that Alcantara failed to show that her arthritic knee impacted her ability to ambulate to the extent required by Section 1.00(B)(2)(b).

As for Alcantara's hypertension, the cardiovascular listing requires that a claimant's hypertension be evaluated with reference to the specific body systems affected, *i.e.*, heart, brain, kidneys, or eyes, because hypertension generally causes disability through its impact on other body systems. Appendix 1 § 4.00(H). The record before the ALJ fails to establish that Alcantara has suffered complications in these other body systems as a result of her hypertension. In fact, Dr. Fajardo's examinations repeatedly found that all of her body systems were normal. (Tr. 102, 118–21, 124, 126–28, 136–37, 139, 154, 156).

Finally, ALJ Strauss correctly noted that Alcantara failed to demonstrate that she suffered from any of the diabetic complications described in Section 9.08 relating to diabetes mellitus. (*Id.* at 14). This listing requires a showing of either:

> (A) neuropathy demonstrated by significant and persistent disorganization of motor function in two extremities resulting in sustained disturbance of gross and dexterous movements, or gait and

station (*see* 11.00C); or (B) acidosis [27] occurring at least on the average of once every 2 months documented by appropriate blood chemical tests (pH or pCO2 or bicarbonate levels); or (C) retinitis proliferans[.]

Appendix 1 § 9.08. On several occasions, Alcantara's treating physician noted that she had diabetic neuropathy. (Tr. 101–02, 118). As the Commissioner points out, however, the doctor made these entries in 2000 and 2001, prior to Alcantara's alleged onset of disability date in 2002. (Comm'r's Mem. at 18–19). Despite her frequent doctor's visits, there simply is no evidence that during the relevant period Alcantara complained of tingling or other symptoms of neuropathy, or that Dr. Fajardo found her to be suffering from neuropathy. Even if there were, there is no evidence to suggest that any neuropathy in 2000 or 2001 impacted Alcantara's motor function to the extent required by the Listing. Indeed, Dr. De Leon noted that Alcantara walked with only a "slight limp." (*Id.* at 87).

Finally, although there was nothing in either Dr. De Leon's assessment or Dr. Fajardo's records indicating that Alcantara had any sustained disturbance in the movement of any of her other extremities or suffered from acidosis, the ALJ correctly recognized that an ophthalmic examination revealed a significant history of diabetic retinopathy, and macular edema. (*Id.* at 14). However, this examination took place on September 29, 2005, almost a year after Alcantara ceased to qualify for disability insurance benefits. Moreover, even if one were to assume that Alcantara's visual problems occurred during the alleged disability period, Section 9.08(c) requires that they be evaluated under the criteria in Sections 2.02–2.04 of Appendix 1. There is no evidence that Alcantara's visual impairments reached the level of severity required by those listings.[28]

After properly finding that none of Alcantara's impairments met or medically equaled the relevant Listings, ALJ Strauss continued to the fourth step of the sequential analysis.

### 4. *Fourth Step*

■ At the fourth step, the ALJ must determine whether the claimant's impairments prevented her from doing her past relevant work, taking into consideration the claimant's symptoms to the extent that they are consistent with objective medical evidence and other evidence. 20 C.F.R. §§ 404.1520(a)(4)(i), (e)-(f); 404.1560(b)(2). In doing so, the ALJ must determine the claimant's RFC, or what the claimant is able to do despite any impairments, taking into consideration relevant medical and other evidence from the case record. *Id.* § 404.1545(a)(3). The ALJ's RFC analysis must "set forth a logical explanation of the effects of the symptoms, including pain, on the individual's ability to work." SSR 96–8p, 1996 WL 374184, at *7 (Jul. 2, 1996). If the claimant can still perform past rele-

---

**27.** Acidosis is a "pathologic state characterized by an increase in the concentration of hydrogen ions in the arterial blood above the normal level, 40 nmol/L, or pH 7.4[, which] may be caused by an accumulation of carbon dioxide or acidic products of metabolism, or by a decrease in the concentration of alkaline compounds." *Stedman's.*

**28.** Section 2.02 requires a showing of a loss of visual acuity, with "remaining vision in the better eye after best correction [being] 20/200

or less." Section 2.03 requires a showing of contraction of the visual field in the better eye, as measured by various indicators. Section 2.04 requires a showing of loss of "visual efficiency of the better eye of twenty percent or less after best correction." As the ALJ noted, Alcantara's best corrected vision was 20/25 in the right eye and 20/30 in the left eye, and Dr. Fajardo found "no systemic abnormalities on examination." (Tr. 14).

vant work either as it was performed or as is performed in the general economy, the ALJ must find that the claimant is not disabled. 20 C.F.R. § 404.1520(a)(4)(iv).

Here, the ALJ found that Alcantara had the RFC to "[s]it for six hours in an eight-hour workday; stand and walk for one hour at a time for a total of four hours in an eight-hour workday; lift/carry 10 pounds; [and] use foot controls." (Tr. 16). Alcantara's past relevant work as a seamstress required her to carry bundles of ten pounds or less, sit while working, and use foot controls. (*Id.* at 16, 79). Alcantara contends that ALJ Strauss erred in her RFC determination by refusing to accept fully Alcantara's testimony regarding the extent of her headaches, dizziness, and joint pain, which she asserts is supported by objective medical evidence. (Pet'r's Mem. at 18–20). According to Alcantara, the ALJ "completely dispense[d] with the evidence of leg pain when determining that [she] somehow retain[ed] the ability to perform 'light' work as a seamstress," noting that light work requires the use of the feet for two-thirds of the day. (Pet'r's Mem. at 19). Alcantara further contends that ALJ Strauss failed to make a proper credibility determination because she made only "a single, conclusory statement" that Alcantara's allegations about her symptoms were not credible. (*Id.* at 22) (citing SSR 96–7p, 1996 WL 374186). Finally, she contends that the ALJ failed to consider and credit her good work record in assessing her credibility. (*Id.* at 23).

The regulations set forth a two-step process to evaluate a claimant's testimony regarding symptoms. *Murphy v. Barnhart,* No. 00 Civ. 9621(JSR)(FM), 2003 WL 470572, at *10 (S.D.N.Y. Jan. 21, 2003). First, the ALJ must consider whether the claimant has a medically-determinable impairment which could reasonably be expected to produce the pain or symptoms alleged by the claimant. *Sarchese v. Barnhart,* No. 01 Civ. 2172(JG), 2002 WL 1732802, at *7 (E.D.N.Y. Jul. 19, 2002) (citing SSR 96–7p, 1996 WL 374186, at *2 (Jul. 2, 1996)); 20 C.F.R. §§ 404.1529(b), 416.929(b). Then, if the claimant makes statements about her symptoms that are not substantiated by objective medical evidence, the ALJ must make a finding as to the claimant's credibility. *Sarchese,* 2002 WL 1732802, at *7; SSR 96–7p, 1996 WL 374186, at *1 (Jul. 2, 1996). Such an evaluation of a claimant's credibility is entitled to great deference if it is supported by substantial evidence. *Bischof v. Apfel,* 65 F.Supp.2d 140, 147 (E.D.N.Y.1999); *see also Gernavage v. Shalala,* 882 F.Supp. 1413, 1419 n. 6 (S.D.N.Y.1995) ("Deference should be accorded the ALJ's determination [as to claimant's credibility] because [she] heard [claimant's] testimony and observed [her] demeanor.").

■ In assessing a claimant's credibility, the ALJ must consider all of the evidence in the record and give specific reasons for the weight accorded to the claimant's testimony. *Lugo v. Apfel,* 20 F.Supp.2d 662, 663 (S.D.N.Y.1998); SSR 96–7p, 1996 WL 374186, at *4 (Jul. 2, 1996). The regulations require the ALJ to consider not only the objective medical evidence, but also

[ (a) t]he individual's daily activities; [ (b) t]he location, duration, frequency, and intensity of the individual's pain or other symptoms; [ (c) f]actors that precipitate and aggravate the symptoms; [ (d) t]he type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms; [ (e) t]reatment, other than medication, the individual receives or has received for relief of pain or other symptoms; [ (f) a]ny measures other than treatment the individual uses or has used to relieve pain or other

symptoms ...; and [ (g) a]ny other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms.

SSR 96–7p, 1996 WL 374186, at *3 (Jul. 2, 1996) (citing 20 C.F.R. §§ 404.1529(c), 416.929(c)); *see also Sarchese*, 2002 WL 1732802, at *7 (listing factors).

In the Findings section of her decision, ALJ Strauss summarized her credibility finding in a single statement, indicating that Alcantara's "allegations regarding her limitations are not totally credible for the reasons set forth in the body of the decision." (Tr. 16). In the body of the decision, the ALJ had noted, *inter alia,* the changes in Alcantara's work schedule due to the closure of her employer, that her diabetes, hypertension, and dizziness were controllable with medication, and that she did not take medication for joint pain or insulin for diabetes. (*Id.* at 15). The ALJ also had indicated that there was no evidence that Alcantara had "headaches or joint pain [of] an intensity or frequency that would prevent her from working." (*Id.*).

Although the ALJ provided additional information about Alcantara's alleged symptoms in the body of the decision, she did not specifically explain how these factors impacted her assessment of Alcantara's credibility, and ultimately, the RFC determination. It may be, for example, that the ALJ concluded that the fact that Alcantara stopped working shortly before the alleged onset date because her company had closed, rather than because of a physical impairment, undercut her claim of disabling pain. In addition, the ALJ may have believed that the ability to control Alcantara's conditions with medication undermined her representations that her symptoms were severe enough to prevent her from working. The ALJ also may have questioned Alcantara's representa-

tions about the severity of her symptoms because she did not take medication for her joint pain or insulin for her diabetes and had been inconsistent in treatment compliance.

Unfortunately, because the ALJ did not detail the basis for her credibility assessment with respect to Alcantara's alleged symptoms, it is impossible for the Court to conduct a meaningful review of her findings at Step Four to determine whether they are supported by substantial evidence. *See Williams v. Bowen,* 859 F.2d 255, 260–61 (2d Cir.1988) ("A finding that the witness is not credible must ... be set forth with sufficient specificity to permit intelligent plenary review of the record."); *Kleiman v. Barnhart,* No. 03 Civ. 6035(GWG), 2005 WL 820261, at *12 (S.D.N.Y. Apr. 8, 2005) ("[W]here a claimant's subjective testimony is rejected, the ALJ must do so explicitly and specifically."). Accordingly, the case must be remanded for the ALJ to provide more detailed reasons for her credibility determination, taking into consideration the factors set forth in 20 C.F.R. § 404.1529(c)(3).

## V. *Conclusion*

For the foregoing reasons, Alcantara's motion (Docket No. 10) for judgment on the pleadings should be granted in part, the Commissioner's cross-motion (Docket No. 14) should be denied, and the case should be remanded to permit the ALJ to provide a more detailed credibility determination at Step Four of the required analysis.

## VI. *Notice of Procedure for Filing of Objections to this Report and Recommendation*

The parties shall have ten days from the service of this Report and Recommendation to file written objections pursuant to

28 U.S.C. § 636(b)(1) and Rule 72(B) of the Federal Rules of Civil Procedure. *See also* Fed.R.Civ.P. 6(a) and (d). Any such objections shall be filed with the Clerk of the Court, with courtesy copies delivered to the chambers of the Honorable Richard J. Sullivan and to the chambers of the undersigned at the United States Courthouse, 500 Pearl Street, New York, New York 10007, and to any opposing parties. *See* 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 6(a), 6(d), 72(b). Any requests for an extension of time for filing objections must be directed to Judge Sullivan. The failure to file these timely objections will result in a waiver of those objections for purposes of appeal. *See* 28 U.S.C. § 636(b)(1); Fed. R.Civ.P. 6(a), 6(d), 72(b); *Thomas v. Arn*, 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985).