Frank DeCHIRICO, Plaintiff–Appellant,

v.

John J. CALLAHAN, Acting Commissioner of the Social Security Administration, Defendant–Appellee.

No. 248, Docket 97–6026.

United States Court of Appeals, Second Circuit.

Argued Sept. 26, 1997.

Decided Jan. 26, 1998.

Toby Golick, Cardozo Bet Tzedek Legal Services, New York City, for Plaintiff–Appellant.

Stanley N. Alpert, Assistant United States Attorney, New York City, for Defendant–Appellee.

Before MESKILL and CALABRESI, Circuit Judges, and KOELTL,* District Judge.

Judge MESKILL concurs in part and dissents in part in a separate opinion.

CALABRESI, Circuit Judge:

Is a leg amputation a *per se* disabling condition under the Social Security Regulations, 20 C.F.R. § 404.1520(d) & Pt. 404, Subpt. P, App. 1, § 1.10, if the amputee cannot reasonably obtain a properly fitting prosthesis that will allow the wearer to walk without an "obligatory assistive device" such as a cane? We conclude that it is. Because, however, the plaintiff did not meet his burden of showing that he was in fact unable to obtain a properly fitting prosthesis, we affirm the denial of benefits.

## Background

Frank DeChirico is a thirty-eight year old man who received disability benefits for over nine years following a 1981 motorcycle accident in which he sustained injuries that ultimately resulted in the amputation of the lower portion of his left leg. He now wears a prosthetic limb. In 1990, DeChirico's benefits were terminated because he was incarcerated. *See* 20 C.F.R. § 416.1325 (providing for suspension of benefits to a recipient who is a resident of a "public institution"); 20 C.F.R. § 416.1335 (providing for termination of benefits following twelve consecutive months of benefit suspension). On November 24, 1992, just prior to his release from prison, DeChirico reapplied for disability benefits.

Following a hearing, the administrative law judge ("ALJ") determined that DeChirico was not disabled, and denied his application. The ALJ made the following factual findings: (1) DeChirico had not worked since the late 1970's (prior to his accident). (2) He suffered from a "severe" impairment—the leg amputation—but "[did] not have an impairment or combination of impairments listed in, or medically equal to one listed in" the

Social Security regulations defining *per se* disabling conditions.[1] (3) His "subjective testimony as to 'disabling' ... impairment [was] not supported by objective medical evidence and [was] therefore not credible in establishing [a] 'disability.'" (4) He has the residual functional capacity "to perform the full range of 'sedentary' and 'light' work." (5) His age falls into the category of "younger" under the regulations. (6) He has a high school equivalency degree. And (7) he is not "disabled."

The Appeals Council denied DeChirico's request for review, thereby making the ALJ's ruling the final decision of the Commissioner. *See Perez v. Chater,* 77 F.3d 41, 44 (2d Cir.1996); 20 C.F.R. §§ 404.981, 416.1481. DeChirico then appealed the decision in the district court (Eugene H. Nickerson, *Judge* ), which granted the Commissioner's motion for judgment on the pleadings and dismissed the action. DeChirico now appeals that ruling, arguing (1) that the ALJ erred in concluding that he was not disabled *per se;* (2) that the ALJ also erred in failing to subpoena DeChirico's Social Security file from the nine-year period when (prior to being incarcerated) DeChirico was receiving disability benefits; and (3) that there was insufficient evidence to support the ALJ's conclusion that DeChirico was capable of performing sedentary or light work.

## Discussion

### I. The Applicability of Listing § 1.10

The Social Security regulations establish a five-step process for evaluating disability claims:

First, the [Commissioner] considers whether the claimant is currently engaged in substantial gainful activity. If he is not, the [Commissioner] next considers whether the claimant has a "severe impairment" which significantly limits his physical or mental ability to do basic work activities. If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which is listed in Appendix 1

---

* The Honorable John G. Koeltl, District Judge of the United States District Court for the Southern District of New York, sitting by designation.

1. The ALJ also found that DeChirico does not have severe "psychiatric" impairments.

of the regulations. If the claimant has such an impairment, the [Commissioner] will consider him disabled without considering vocational factors such as age, education, and work experience; the [Commissioner] presumes that a claimant who is afflicted with a "listed" impairment is unable to perform substantial gainful activity. Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, he has the residual functional capacity to perform his past work. Finally, if the claimant is unable to perform his past work, the [Commissioner] then determines whether there is other work which the claimant could perform.... [T]he claimant bears the burden of proof as to the first four steps, while the [Commissioner] must prove the final one.

*Berry v. Schweiker,* 675 F.2d 464, 467 (2d Cir.1982).

The ALJ in this case determined that DeChirico was not performing substantial gainful activity and that his amputation constituted a "severe impairment." Thus, DeChirico's claim survived the first two steps of the inquiry. The ALJ concluded, however, that DeChirico could not be deemed *per se* disabled at step three because his severe impairment did not qualify under Listing § 1.10. Having so determined, the ALJ then went on to find that DeChirico had no past relevant work (step four), but that he could perform "sedentary" or "light" work (step five). DeChirico argued on appeal to the district court, and again in this court, that the ALJ erred in failing to find him *per se* disabled at step three, which would have made him eligible for benefits regardless of steps four and five.

■ The Social Security regulations list certain impairments, any of which is sufficient, at step three, to create an irrebuttable presumption of disability. *See* 20 C.F.R. §§ 404.1520(d), 416.920(d); *see also id.* at Pt. 404, Subpt. P, App. 1 (listing of *per se* disabling conditions). The regulations also provide for a finding of such a disability *per se* if an individual has an impairment that is "equal to" a listed impairment. *See id.* § 404.1520(d) ("If you have an impairment(s)

which ... is listed in appendix 1 or is equal to a listed impairment(s), we will find you disabled without considering your age, education, and work experience.").

Persons who, like DeChirico, have leg amputations at or above the tarsal region (i.e., the ankle) are disabled *per se* if they meet any of a number of other criteria specified in the regulations. *See id.* at Pt. 404, Subpt. P, App. 1, § 1.10 ("Listing § 1.10"). The only "listed" criterion relevant to this case is:

C. Inability to use a prosthesis effectively, without obligatory assistive devices, due to one of the following:

. . . .

3. Stump too short or stump complications persistent, or are expected to persist, for at least 12 months from onset....

Listing § 1.10.C.

DeChirico testified at his disability hearing that, because of ongoing problems wearing his prosthesis, he had difficulty standing and could not walk at all without a cane—which qualifies as an "assistive device." *See, e.g., Walker v. Bowen,* 826 F.2d 996, 998 (11th Cir.1987) (quoting medical evidence treating a cane as an assistive device); 14 C.F.R. § 382.41(c) (requiring airlines to permit disabled passengers "to stow canes and other assistive devices" near their seats); 42 C.F.R. § 488.115, at 727 (stating that the dining areas of nursing homes must have "sufficient space between tables to allow for safe passage of wheelchairs and residents with walkers, canes and other assistive devices").

According to DeChirico, his health problems at the time he sought disability coverage included, *inter alia,* stump scarring and intermittent inflammation or "skin breakdown" on the stump. He further argues that most or all of these difficulties resulted from prosthesis intolerance (the inability to obtain a prosthesis that fits properly and causes no injury to the wearer). The Commissioner responds that there was ample evidence in the record to support the ALJ's decision that DeChirico could use his prosthesis effectively, and hence that DeChirico was not *per se* disabled. DeChirico denies that the evidence

supported that conclusion. We review the sufficiency of the evidence in light of the requirements of Listing § 1.10.

Although we have not had occasion to interpret Listing § 1.10, the Ninth and Tenth Circuits each have done so.[2]

*Gamble v. Chater*, 68 F.3d 319 (9th Cir. 1995), was the first case to analyze the relevant portions of the listing. Gamble was an amputee who had suffered from various stump complications, including skin breakdown and pressure sores. *Id.* at 320. The medical evidence was clear that Gamble's ill-fitting prosthesis had caused these problems and had left him unable to walk without crutches ("assistive devices"). *See id.* A new prosthesis had been prescribed to treat the complications, but was not reasonably available to Gamble. The ALJ concluded that Gamble's inability to get a suitable prosthesis did not constitute "stump complications" under Listing § 1.10, and denied the application.

The Court of Appeals for the Ninth Circuit reversed. It held that Gamble qualified under Listing § 1.10 because his inability to obtain the new prosthesis forced him to continue wearing one that did not fit. And, for that reason, he could not use his prosthesis effectively without crutches. The court concluded that "a person whose leg was amputated at or above the tarsal region satisfies Listing § 1.10 if he is unable to use any prosthesis that is reasonably available to him," *id.* at 322, regardless of whether "somewhere on the planet there exists a prosthesis that the claimant could use," *id.* Since the Commissioner offered "no legitimate reason or explanation why an amputee who is unable to obtain a prosthesis should be treated differently from any other dis-

abled person who [is entitled to benefits because he] cannot obtain the treatment, therapy, or medical device that he needs," *id.*, the court reversed and remanded with instructions that Gamble be awarded benefits.

■ In *Puckett v. Chater*, 100 F.3d 730 (10th Cir.1996), the Court of Appeals for the Tenth Circuit took a somewhat different view of Listing § 1.10. The specific ground on which that Court rejected the disability claim in *Puckett* seems to have been that, on the particular facts of the case, the court did not believe that the claimant (who had used a prosthesis successfully for twenty years until it broke) could not obtain an adequate replacement. In reaching that conclusion, however, the court also stated that:

> We believe Listing § 1.10 plainly requires stump complications, not problems with prosthetic fit.... [The listed] conditions all relate to problems of the claimant's body itself. Problems with technicians' ability to repair or replace a prosthesis that a claimant used satisfactorily for twenty years does not fall within the scope of the listing.

*Id.* at 733.

We read the *Puckett* court's statement to mean that the inability to obtain a well-fitting prosthesis is not disabling *per se* unless it either results from or leads to a medically observable condition in the wearer's body. This view is wholly consistent with *Gamble*, for in *Gamble* the claimant's old prosthesis caused pressure sores and skin breakdown.

We believe that this view is the correct one, and, indeed, is the only one that comports with the language of Listing § 1.10.C.3. That listing defines "stump complications" as one of the conditions that may qualify as

---

**2.** The First Circuit has also interpreted Listing § 1.10. In *Gagnon v. Secretary of Health & Human Services*, 666 F.2d 662 (1st Cir.1981), a case on which the Commissioner relies here, that court considered whether the ALJ erred in finding no listed disability where the claimant had, while wearing a leg prosthesis, worked on construction projects for some twenty-one years doing "very heavy" and "exceedingly dangerous" work. When the claimant's stump became infected, he applied for disability benefits on the grounds that he found it difficult to use his prosthesis, and that uneven postural develop-

ment resulting from the amputation (as well as some other, unrelated medical problems) left him unable to work. *See id.* at 663. The First Circuit concluded that the ALJ's implicit finding that the claimant could use a prosthesis effectively was supported by substantial evidence in the record (although it vacated and remanded on other grounds). *See id.* at 664. *Gagnon* is not helpful in deciding this appeal, however, because the disability claim in that case was not based on any prosthesis fit problems, and because it apparently did not involve a claimant who used an obligatory assistive device.

disabling *per se.* And there is no valid ground for distinguishing between unresolvable stump complications that result from improper prosthesis fit (such as those that Gamble suffered) and the same symptoms that arise for other reasons. Specifically, we see no legitimate basis in the regulations or the listing for concluding that the term "stump complications" excludes such physical ailments of the stump as chronic infections caused by an improperly fitting prosthesis, while including similar infections that derive from the amputation process itself, or from the shape and character of the stump. For that reason, we agree with the Court of Appeals for the Ninth Circuit that prosthesis intolerance constitutes a stump complication under Listing § 1.10, and that it does so as to all complications that flow from an amputee's inability "to use any prosthesis that is reasonably available to him." *Gamble,* 68 F.3d at 322.

■ Even if we were not persuaded that Listing § 1.10 specifically covers individuals who suffer complications because of their inability to obtain a properly fitting prosthesis, we would nonetheless conclude that such a condition is equal to a listed impairment, and hence is also disabling *per se.* The Social Security regulations provide that, "[i]f you have an impairment(s) which meets the duration requirement and is listed in appendix 1 *or is equal to a listed impairment(s),* we will find you disabled without considering your age, education, and work experience." 20 C.F.R. §§ 404.1520(d), 416.920(d) (emphasis added). Because there is no meaningful difference between complications resulting from poor prosthesis fit and complications developing for other reasons, such problems (if they cannot be resolved by the application of a suitable prosthesis that is reasonably available to the claimant) are undeniably "equal to" the other conditions specified in Listing § 1.10. For this reason, too, prosthesis fit problems of the nature suffered by Gamble, and alleged in this case by DeChirico, can result in *per se* disability.

## II. The ALJ's Finding of No Disability *Per Se*

■ Reviewing the evidence in the record in light of Listing § 1.10's requirement that a prosthesis fit problem must either be caused by or result in a medically observable condition in the wearer, we uphold the ALJ's factual findings and affirm the denial of benefits. *See Keefe v. Shalala,* 71 F.3d 1060, 1062 (2d Cir.1995) (the findings of fact in a disability determination must be upheld if they are supported by substantial evidence).

To be sure, there is substantial evidence in the record that DeChirico, since at least September 1990, has had significant problems wearing a prosthesis. In particular, DeChirico's prison record, the recommendations of treating physicians Albert Fleischer, Stanley Soren, and Stephen Nadler, and the report of examining physician Joseph Fulco of the New York State Department of Social Services Office of Disability Determinations would certainly have been sufficient to support a finding that DeChirico was disabled *per se.* But there was also substantial evidence in the record from which the ALJ could have reasonably concluded that a properly fitting appliance would have solved DeChirico's problems.

For example, Dr. Soren stated that DeChirico was disabled pending receipt of a new prosthesis. This comment can be taken to mean that Dr. Soren believed that a suitable prosthesis was reasonably available to DeChirico, and that receipt of such an appliance would solve DeChirico's stump problems. This fact is especially germane because Dr. Soren also reported that DeChirico's stump was not inflamed. Moreover, the record does not indicate whether DeChirico received the new prosthesis Dr. Soren prescribed, so there is no evidence that DeChirico tried a substitute prosthesis unsuccessfully.

Similarly, from September 1990 to October 1991, there is no reference in DeChirico's prison medical records to any problems with his prosthesis or stump. In the absence of testimony or other evidence that DeChirico's difficulties continued throughout that period, the ALJ could reasonably have inferred that DeChirico used a prosthesis effectively for thirteen months. And DeChirico offered no testimony, medical report, or other evidence to show that his stump complications persist-

ed at that time. This fact is not only significant in itself, but also suggests that when a proper prosthesis *was* made available, DeChirico may not have been disabled.

Specifically, DeChirico received a new prosthesis sometime before September 1990. At that time, according to prison health service medical records, the "new" prosthesis was "definitely too small on thigh & too large at calf—needs adjust. if possible." There is no indication whether any such adjustments were successfully made. But the prison medical records, which detail no further complaints by DeChirico until October 9, 1991, are consistent with the conclusion that the adjustments were in fact made and were successful. They therefore can also be taken as support for a finding that, at the later times when DeChirico did complain, his complications could have been resolved by fitting him with an effective prosthesis. There are, moreover, no grounds for believing that such an appliance was not reasonably available to him.

Under the circumstances, we cannot say that the ALJ's finding that DeChirico did not have a listed impairment (or its equivalent) was unsupported on the record. This does not mean, of course, that DeChirico is barred from filing a new application for benefits, supported by evidence of prosthesis-induced stump complications sufficient to lead—or indeed require—an ALJ to find him to have a *per se* disabling condition.

### III. Failure to Subpoena Prior Disability File

■ DeChirico also claims that, in light of our decision in *Mimms v. Heckler,* 750 F.2d 180 (2d Cir.1984), reversal is warranted because the ALJ failed to requisition or subpoena the disability file for the nine-year period when DeChirico had previously received disability benefits. *Mimms* involved a former truck driver who had been paid benefits from 1977 to 1980. Those benefits terminated when Mimms voluntarily attempted to go back to work. He was soon fired, however, because he was unable to perform his job duties. Accordingly, he submitted a new application for benefits, but that application was denied. He pursued his administrative

remedies, *pro se,* and the ALJ denied his claims. On appeal, we reversed and remanded, concluding that the ALJ had improperly disregarded Mimms' testimony concerning disabling pain. In reaching that conclusion, we also stated:

> In a case such as this, where the claimant was unrepresented by counsel in the proceedings before the ALJ, "a duty devolves on the hearing examiner to scrupulously and conscientiously probe into, inquire of, and explore all the relevant facts surrounding the alleged right or privilege." After a careful review of the transcript of the disability hearing conducted by the ALJ, we find that he failed to adequately develop the record so as to provide Mimms with a full and fair hearing. Specifically, despite the fact that the claimant testified that he had been determined disabled in June of 1977 and had received disability benefits until October 1980, when he voluntarily attempted to resume gainful employment, the ALJ failed to ask one question of the claimant about his prior disability and its relationship to the disability claim he was now pursuing before the ALJ. The existence of a prior established disability is highly relevant when the nature of that disability appears to be the very same cause of the alleged disability then under examination.

*Id.* at 185 (citation omitted). DeChirico argues that "[t]he holding of *Mimms,* applied to the facts of this case, would require at the least a remand with directions to the agency to obtain and consider the records concerning the claimant's prior nine year receipt of benefits," because those records were "highly relevant" to both step three and step five of the evaluation of his current claim.

The Commissioner counters that the old disability file would shed no additional light on DeChirico's claims, and asserts that the ALJ's review of the medical records from DeChirico's period of incarceration was sufficient to establish his prior medical history. In so arguing, the Commissioner relies in part on Social Security Administration guidelines providing that "an ALJ May Not Need the Prior Claim File" when "[a]t least four years have elapsed between the date of the

prior notice of initial determination and the date of the new application." Social Security Administration Office of Hearings and Appeals, *HALLEX: Hearings, Appeals and Litigation Law Manual* ("*HALLEX Manual*"), I–2–110D (June 1994).

DeChirico is correct that, by statute, the ALJ was required not only to develop DeChirico's complete medical history for at least the twelve-month period prior to the filing of his application, but also to gather such information for a longer period if there was reason to believe that the information was necessary to reach a decision. *See* 42 U.S.C. § 423(d)(5)(B) (as incorporated by 42 U.S.C. § 1382c(a)(3)(G)); 20 C.F.R. § 416.912(d). Similarly, Social Security regulations required the ALJ to subpoena DeChirico's prior disability file if it was "reasonably necessary for the full presentation of [the] case." 20 C.F.R. § 416.1450(d)(1). And the fact that the *HALLEX Manual* guidelines specify that ALJs *may* not need prior files that are more than four years old does not purport to alter the statutory duty to develop the record fully by reviewing older materials when doing so is necessary to render a fair determination.

Nevertheless, this case presents very different circumstances from *Mimms*. *Mimms* involved a *pro se* claimant whereas DeChirico was represented by counsel in the administrative proceedings. Pursuant to Social Security regulations, a party "who wish[es] to subpoena documents or witnesses must file a written request for the issuance of a subpoena with the administrative law judge .... stat[ing] the important facts that the witness or document is expected to prove; and indicat[ing] why these facts could not be proven without issuing a subpoena." 20 C.F.R. § 416.1450(d)(2). While DeChirico is surely correct to argue on appeal that his old disability file might have proven to be "highly relevant," counsel's letter requesting the subpoena did not include any of the required information. In fact, the *only* justification for a subpoena that counsel offered was the single statement that "[w]e believe there is material in [DeChirico's] previous file that may be useful to the present case." In other words, the petition in no way complied with the requirements of § 416.1450(d)(2).

The statutory duty of an ALJ to issue subpoenas or take other actions *sua sponte* as necessary to develop the record applies, of course, to all claimants, *see* 42 U.S.C. § 423(d)(5)(B) (as incorporated by 42 U.S.C. § 1382c(a)(3)(G)); 20 C.F.R. §§ 416.912(d), 416.1450(d)(1), and not just to those who appear *pro se*. But because DeChirico *was* represented by counsel, because the fact of his impairment was not in dispute, and because counsel offered no other reasons that the ten-year old file might be relevant, we cannot say that the ALJ abused his discretion in failing to subpoena it on his own initiative.

## IV. Sufficiency of the Evidence of Residual Functional Capacity

■ Finally, DeChirico argues that there was insufficient evidence to permit a determination at step five that he was capable of performing sedentary or light work. But this conclusion by the ALJ was based on the reports of DeChirico's treating physicians. For example, Dr. Fleischer stated that, if DeChirico used the correct prosthesis and was careful, he could go to school or do a sedentary job. Similarly, Dr. Nadler reported that DeChirico could "tolerate light manual activities for a limited period of time." All this and other medical evidence in the record is sufficient to support the ALJ's factual findings at step five. *See Keefe*, 71 F.3d at 1062.

### Conclusion

We have considered all of DeChirico's arguments. On the administrative record before us, the district court's affirmance of the ALJ's ruling is affirmed. DeChirico is, of course, free to file a new application for benefits, pursuant to the relevant regulations, and to present new evidence of his disability at that time.

MESKILL, Circuit Judge, concurring in part and dissenting in part:

I join in the majority's holding that the Commissioner's decision is supported by substantial evidence, but write separately to dis-

sent from part I of the opinion's Discussion. Specifically, I object to the majority's suggestion that, under Listing § 1.10.C., we assess a claimant's "[i]nability to use a prosthesis effectively" against only those prostheses that are *"reasonably available"* to the claimant (quoting *Gamble v. Chater*, 68 F.3d 319, 322 (9th Cir.1995) (emphasis added)).

In *Gamble*, the claimant suffered stump complications caused by an ill-fitting prosthesis. The court held that notwithstanding the existence of a properly fitting replacement prosthesis, the claimant had demonstrated an "[i]nability to use a prosthesis effectively" because the well-fitting replacement prosthesis was unaffordable and therefore not "reasonably available." Here, although neither party has argued or briefed the merits of *Gamble*'s construction of Listing § 1.10.C., the majority in dicta nonetheless expresses its agreement with *Gamble*. DeChirico's sole argument under Listing § 1.10.C. was that the injuries resulting from his use of six prostheses demonstrated that he could not use any prosthesis without injury. DeChirico did not argue in the alternative that, in the event the court determined that a serviceable prosthesis did exist, he nevertheless would meet Listing § 1.10.C. because the replacement prosthesis was not "reasonably available." Accordingly, the Commissioner, responding only to DeChirico's arguments and unaware that the majority would consider this unaddressed issue, did not have the opportunity to contest the merits of *Gamble*.

I, therefore, would limit the majority's discussion of *Gamble* to the issues actually raised in this case, namely, whether a claimant's inability to use a prosthesis without causing himself injury constitutes a stump complication under Listing § 1.10.C., and whether substantial evidence supported the Commissioner's decision that DeChirico could use a prosthesis effectively. The language of Listing § 1.10.C. does not expressly limit our assessment of a claimant's ability "to use a prosthesis effectively" to those prostheses that are "reasonably available." Nor is it clear that this limitation reflects sound policy. *See* Social Security Acquiescence Ruling 97–2(9) (acquiescing to *Gamble* only in the Ninth Circuit). I prefer to refrain from supporting this construction until the issue of availability has been squarely raised in this Circuit. Notably, the majority expressly reminds DeChirico that he is not barred from filing a new application for benefits. The majority's unsolicited approval of *Gamble* might be construed as an invitation to DeChirico to refile his claim using *Gamble*'s reasoning. If the majority intends to send that message, I strenuously object. We should not give an advisory opinion that may commit our Court to a position on an issue that has not been argued.