In the

# United States Court of Appeals

## For the Seventh Circuit

No. 16-4007

ASHLEY GERSTNER,

*Plaintiff-Appellant,*

*v.*

NANCY A. BERRYHILL,

*Defendant-Appellee.*

Appeal from the United States District Court for the
Eastern District of Wisconsin.
No. 15-CV-1115 — **Nancy Joseph**, *Magistrate Judge.*

ARGUED OCTOBER 3, 2017 — DECIDED JANUARY 5, 2018

Before KANNE, ROVNER, and SYKES, *Circuit Judges.*

ROVNER, *Circuit Judge.* Ashley Gerstner challenges the denial of her application for disability insurance benefits and supplemental security income. An administrative law judge found that she was severely impaired by anxiety, bipolar disorder, panic disorder, depression, and fibromyalgia, and that these impairments were not disabling. Gerstner contends that the ALJ erred in assigning too little weight to her treating psychiatrist's opinions and in discrediting her com-

plaints of fibromyalgia pain. We vacate the judgment and remand.

## I.

Gerstner was 27 when she applied for disability benefits and supplemental security income, alleging an onset date of May 2011. Her mental impairments manifested during her high school years. She was admitted to a psychiatric hospital at 15 and has been treated with psychiatric and counseling services. Because of anxiety, she was home schooled; she later transferred to a high school where she received her degree by learning mostly on a computer by herself. She then worked as an assistant manager at Blockbuster for five years but quit abruptly after experiencing what she described as a "mental breakdown." She moved on to work at another retail store in a managerial position that required fewer skills than her previous job, but quit after six months because she experienced another breakdown. Since May 2011, Gerstner has remained unemployed.

Between mid-2011 and mid-2012, Gerstner was treated six times by Dr. Stephen Callaghan, M.D., a psychiatrist at Psychiatric Treatment Services of Racine. In those visits, Dr. Callaghan, who had treated Gerstner since 2006, diagnosed her with generalized anxiety disorder, depression, and attention deficit disorder. He prescribed Xanax and other medications, and he frequently adjusted the dosages. But Dr. Callaghan also noted that Gerstner appeared euthymic (non-depressed) with normal affect.

In connection with Gerstner's application for benefits, Dr. Callaghan completed a form assessment of Gerstner's mental health in mid-2012 and opined that she was extreme-

ly limited socially and at work. He noted that since 2010 Gerstner's mental health had deteriorated, and he estimated that on average she could work only two to three hours per day and likely would miss work seven days per month. In response to a series of questions about "social adjustments," he checked boxes indicating that she had marked-to-extreme limitations behaving in an emotionally stable manner, relating predictably in social situations, and demonstrating reliability. He supported this assessment with findings that she periodically felt suicidal and homicidal, had major problems with social relations, and would withdraw from stressful situations and not be able to function. On another part of the form, in a section related to "occupational adjustments," he checked boxes reflecting that Gerstner had marked-to-extreme limitations in her ability to deal with work stresses and moderate-to-marked limits in maintaining attention— findings that he based on her severe anxiety, depression, and problems "handling any stress without shut[ting] down." Lastly, in response to a series of questions about "performance adjustments," he assessed Gerstner as markedly limited in her ability to understand and carry out detailed job instructions because she would be overwhelmed by anxiety and depression.

After this assessment, Dr. Callaghan treated Gerstner seven more times (all within a year), added diagnoses of bipolar disorder and panic disorder with agoraphobia, prescribed medications to treat both, and noted that she had a dysthymic mood (depressed) each visit. On one occasion Dr. Callaghan noted that she had ideas of suicide and homicide. But in subsequent exams, he noted that she no longer had these thoughts and described her affect as normal.

Dr. David Nichols, Ph.D., a psychologist who practiced with Dr. Callaghan, met with Gerstner monthly (sometimes more frequently) for hour-long visits. Dr. Nichols diagnosed her in 2011 with major depressive and generalized anxiety disorders, and in 2013 with bipolar disorder. Gerstner, after filing her disability application, told Dr. Nichols that she continued to look for a factory job.

Gerstner was treated in 2013 by a nurse practitioner, Nancy Maczka, who assessed her mental health on a form identical to the one completed by Dr. Callaghan. She echoed Dr. Callaghan's findings that Gerstner had extreme limitations with relating "predictably in social situations" and "demonstrat[ing] reliability." But unlike Dr. Callaghan, she found Gerstner more limited in dealing with work stresses and maintaining attention.

In addition to her mental impairment, Gerstner says that she was prevented from working by fibromyalgia. She first complained of pain and weakness to Dr. Joseph Paukner, M.D., in September 2011, and he referred her to a neurologist, Dr. Bhupendra Khatri, M.D., of the Center for Neurological Disorders in Milwaukee. Dr. Khatri examined Gerstner in November 2011, concluded that she was "most likely" suffering from fibromyalgia, and repeated this diagnosis at a follow-up appointment in early January 2012 following an MRI of Gerstner's brain. (The MRI ruled out any neurological change that might have accounted for her complaints of worsening pain). Soon thereafter, Dr. Tracy Brenner, M.D., a physician at the Milwaukee Rheumatology Center, found that Gerstner had fourteen of eighteen positive tender points, a finding that led the doctor to opine that Gerstner had a "high suspicion for fibromyalgia." Dr. Brenner de-

ferred management of that condition to Dr. Paukner and Dr. Callaghan. Dr. Paukner then diagnosed Gerstner with fibromyalgia, for which he prescribed Lyrica, a pain reliever. The next month, in response to Gerstner's complaints of having good and bad days, Dr. Paukner increased the dosage. At an appointment later that year, Gerstner rated her pain from fibromyalgia as a nine out of ten, and was prescribed a stronger pain medication—methadone.

In June 2012, the month before Dr. Callaghan completed his assessment, a state-agency consultant, Dr. Craig Childs, Ph.D., concluded from a review of Gerstner's medical records that she was only moderately limited in several tasks: completing a normal workday and workweek, maintaining concentration for extended periods, carrying out detailed instructions, and interacting with the general public.

Gerstner lost her health insurance in 2013. She ceased treatment with Dr. Callaghan and went six months without medication for her fibromyalgia pain.

The Agency denied Gerstner's application for disability-insurance benefits and supplemental-security income, both initially and on reconsideration.

At a hearing before an ALJ in 2014, Gerstner described how her health had deteriorated since 2010. She testified that she had moved back into her parents' house and experienced trouble interacting with others, handling stress and pressure, sleeping, and concentrating. She added that she had difficulty making phone calls and leaving her house. She said she usually took Xanax twice daily for her anxiety, and she experienced shooting pain from her fibromyalgia that was aggravated by stress, prolonged sitting and stand-

ing, and exercise. Her flare-ups lasted from one to three hours. She worried that working would exacerbate her pain the next day. Since her fibromyalgia diagnosis, she had gained one hundred pounds.

The ALJ applied the standard 5-step analysis, *see* 20 C.F.R. §§ 404.1520(a), 416.920(a), and concluded that Gerstner was not disabled. The ALJ determined that she had not engaged in substantial gainful activity since her alleged onset date (step one); that her conditions—fibromyalgia, depressive disorder, anxiety disorder, bipolar disorder, and panic disorder—were severe impairments (step two); that these impairments did not meet a listing for presumptive disability, individually or in combination (step three); that she had the residual functional capacity to perform light, unskilled work limited to "simple, routine and repetitive tasks," no interaction with the public, and "only occasional interaction with coworkers" (step four); and that although she could not perform her past work, she could work as a night cleaner, price marker, or call router, as a vocational expert had concluded based on the ALJ's assessment of Gerstner's residual functional capacity (step five).

In deciding Gerstner's residual functional capacity, the ALJ discounted her account of disabling limitations and her treating psychiatrist's opinions. The ALJ found that her statements about the "intensity, persistence, and pace" of her symptoms of mental illnesses and fibromyalgia were "not entirely credible." He also gave "little weight" to the mid-2012 opinions of Dr. Callaghan because the limitations he marked were "extreme" compared to Dr. Callaghan's own "findings and observations," which the ALJ said were "relatively normal mental status examinations" with a "few ex-

ceptions." By contrast, the ALJ gave "great weight" to the June 2012 opinion of the reviewing agency consultant, Dr. Childs, who concluded that Gerstner had only moderate limitations. The ALJ also purported to rely on "updated medical evidence" to include "somewhat greater limitations" in Gerstner's residual functional capacity than what Dr. Childs had opined.

After the Appeals Council denied review, a magistrate judge presiding by consent, *see* 28 U.S.C. § 636(c), affirmed the decision of the Commissioner.

## II.

### A.  Treating Psychiatrist's Opinions

On appeal, Gerstner challenges the ALJ's decision to give "little weight" to Dr. Callaghan's opinions in his mid-2012 assessment of her mental health. A treating physician's opinion on the nature and severity of a medical condition is entitled to controlling weight if it is well supported by medical findings and is consistent with other evidence in the record. 20 C.F.R. § 404.1527(c)(1); *Brown v. Colvin*, 845 F.3d 247, 252 (7th Cir. 2016). (This is the rule governing claims filed before March 27, 2017, *see* 20 C.F.R. §§ 404.1520c(a) (2017).) The ALJ declined to give Dr. Callaghan's opinions controlling weight because they were "extreme compared to his own findings and observations. With a few exceptions, Dr. Callaghan noted relatively normal mental status examinations." Gerstner argues that the ALJ cherry-picked Dr. Callaghan's findings about mood and affect and disregarded his diagnoses of depression, anxiety, and other "abnormal findings." She contends also that he failed to consider the requisite factors for

evaluating medical source opinions set forth in the applicable regulation.

We agree with Gerstner that the ALJ fixated on select portions of Dr. Callaghan's treatment notes and inadequately analyzed his opinions. First, with regard to Dr. Callaghan's reports from six exams before August 2012, the ALJ focused on notes about mood and affect but ignored Dr. Callaghan's diagnoses of depression and anxiety disorder. "An ALJ may not selectively discuss portions of a physician's report that support a finding of non-disability while ignoring other portions that suggest a disability." *Campbell v. Astrue*, 627 F.3d 299, 301 (7th Cir. 2010). Here, the ALJ did not specify which of Dr. Callaghan's findings were "normal," but he did say that Dr. Callaghan's observations of Gerstner's euthymic mood and normal affect were inconsistent with her "allegations" of "disabling affective disorders." But Dr. Callaghan made these observations in the same reports before August 2012 in which he diagnosed her with depression and anxiety, and yet the ALJ ignored these diagnoses. Moreover, the affect and mood notes that the ALJ emphasized simply described how Gerstner presented *on the days of her appointments*. They were not general assessments.

Second, the ALJ concluded from Dr. Callaghan's notes after August 2012 that Gerstner's mental health had improved, disregarding other portions of those notes that undermine his conclusion. After August 2012, Dr. Callaghan found during each visit that Gerstner had a normal affect, no "impaired" thoughts, and no suicidal ideations, but also that she reported a dysthymic mood and experienced anxiety, depression, and problems sleeping and concentrating. The ALJ considered only the signs of possible improvements in these

notes and ignored the negative findings. But all findings in psychiatric notes must be considered, even if they were based on the patient's own account of her mental symptoms, *see Price v. Colvin*, 794 F.3d 836, 839–40 (7th Cir. 2015) (citing *Adaire v. Colvin*, 778 F.3d 685, 688 (7th Cir. 2015)). Furthermore, every treatment note after August 2012 repeats Dr. Callaghan's diagnoses and treatments; he even changed the medication for Gerstner's bipolar disorder in January 2013 and increased the dosage three months later. These unchanged diagnoses and the medication adjustments belie the conclusion that Gerstner's mental health had improved.

Third, the ALJ ignored how Dr. Callaghan's mid-2012 opinions of Gerstner's limitations were supported by his repeated findings of depression and dysthymic mood. Dr. Callaghan opined that Gerstner was "extremely limited" with regard to such matters as emotional stability, reliability, and predictability. This opinion conformed to his diagnosis of depression since July 2011 and his observations since August 2012 that Gerstner had a dysthymic mood; dysthymia (depression) is a condition that may "significantly interfere" with work and relationships, *Persistent depressive disorder (dysthymia)*, MAYO CLINIC, http://www.mayoclinic.org/diseases-conditions/persistent-depressive-disorder/home/ovc-20166590 (visited Nov. 27, 2017).

Fourth, the ALJ overlooked the extent to which Dr. Callaghan's opinions were consistent with the diagnoses and opinions of other medical sources who treated Gerstner. ALJs must consider psychologists' and nurse practitioners' opinions on the severity of a patient's impairments. *See* 42 U.S.C. § 423(d)(5)(B); 20 C.F.R. §§ 404.1502(a)(2),

404.1527(a)(1),(b),(c); SSR 06-03P, 2006 WL 2329939 (Aug. 9, 2006) ("[M]edical sources who are not 'acceptable medical sources,' such as nurse practitioners … are important and should be evaluated on key issues such as impairment severity and functional effects."); *see also* 20 C.F.R. § 402.35(b)(1) ("Social Security Rulings … are binding on all components of the Social Security Administration."). The ALJ failed to mention that Dr. Nichols diagnosed Gerstner with the same disorders found by Dr. Callaghan. Nor did the ALJ note that Dr. Callaghan's opinion was supported by Dr. Nichols's rating of Gerstner's Global Assessment of Functioning (GAF), which measured her psychological, social, and occupational abilities. *See* AMERICAN PSYCH. ASSOC., DIAGN. & STAT. MAN. OF MENTAL DISORDERS 34 (4th Ed., Rev. 2000) (DSM-IV). Gerstner's GAF scores ranged from 40 to 55, indicating she had serious difficulty (41 to 50) and moderate difficulty (51 to 60) in these abilities. *Id.*[1] And a nurse practitioner, Maczka, treated Gerstner and opined that her mental abilities were limited to the same extent or more than that found by Dr. Callaghan, but this supporting opinion, which the ALJ wrongly discounted as coming from an unacceptable medical source, went unmentioned in the ALJ's analysis of Dr. Callaghan's opinions.

---

[1] The DSM-V, the latest version of the Diagnostic and Statistical Manual of Mental Disorders, has abandoned the GAF. AMERICAN PSYCH. ASSOC., DIAGN. & STAT. MAN. OF MENTAL DISORDERS 16 (5th Ed., 2013) (DSM-V). But the Social Security Administration still instructs ALJs to treat GAF scores as medical-opinion evidence. *See Craig v. Colvin*, 659 F. App'x 381, 382 (9th Cir. 2016); *Hughes v. Comm'r Soc. Sec.*, 643 F. App'x 116, 119 n.2 (3d Cir. 2016).

Fifth, even if there were sound reasons for refusing to give Dr. Callaghan's opinions controlling weight, the ALJ still erred by assigning his opinions little weight without considering relevant regulatory factors under 20 C.F.R. § 404.1527(c). ALJs must decide the weight of a treating physician's non-controlling opinion by considering, to the extent applicable, the treatment relationship's length, nature, and extent; the opinion's consistency with other evidence; the explanatory support for the opinion; and any specialty of the treating physician. 20 C.F.R. § 404.1527(c); *Moss v. Astrue*, 555 F.3d 556, 561 (7th Cir. 2009); *Bauer v. Astrue*, 532 F.3d 606, 608 (7th Cir. 2008). The ALJ here did not mention that Dr. Callaghan is a psychiatrist, that he was the only psychiatrist who treated Gerstner, that the treatments occurred regularly for six years (sometimes monthly), or that Dr. Callaghan assessed her mental health thirteen times in the two years between the onset date and the date when she lost medical insurance. The ALJ also failed to consider the consistency of Dr. Callaghan's opinion with the opinions of other treating, examining, and reviewing medical sources. Although the ALJ discussed the weight to afford these physicians' opinions, he did not specify how or to what extent he considered these opinions when deciding to assign little weight to Dr. Callaghan's opinions.

Because of these errors, substantial evidence does not support the decision to afford little weight to Dr. Callaghan's opinions of Gerstner's limitations from mental impairments, and the case must be remanded for reconsideration of his opinion, *see Meuser v. Colvin*, 838 F.3d 905, 912 (7th Cir. 2016); *Scott v. Astrue*, 647 F.3d 734, 740 (7th Cir. 2011).

### B. Adverse Credibility Determination

Gerstner also contends that the ALJ wrongly discounted her testimony about the extent of her pain from fibromyalgia. The ALJ, using familiar boilerplate, said that the "claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible." Gerstner argues that the ALJ discredited her complaints of intermittent fibromyalgia pain by overstating findings from examining physicians' diagnostic tests, in which she walked, moved, sensed touch, and had no spasms or tenderness. She argues further that the ALJ wrongly discredited her pain complaints by misstating medical evidence from two examining physicians who recommended that she engage in unspecified physical activity. She contends also that the ALJ drew an unwarranted inference that her pain was not disabling because she went six months without fibromyalgia drugs, but the ALJ never considered the reason she offered for that medication gap. Lastly, Gerstner argues that the ALJ wrongly concluded that she could work based on a physician's notation that she had searched for employment.

We agree with Gerstner that the ALJ's adverse credibility determination must be overturned. This court will overturn an ALJ's adverse credibility finding if it is patently wrong. *See Larson*, 615 F.3d at 745; *Schaaf v. Astrue*, 602 F.3d 869, 875 (7th Cir. 2010). The ALJ here overstated test results and treatment recommendations and drew unjustified inferences from Gerstner's medication gap and job search.

First, the ALJ overstated findings from three diagnostic tests to discredit Gerstner's complaints of intermittent fibromyalgia pain. The ALJ said that Gerstner's pain complaints were inconsistent with her abilities to sit, move, and

walk for an unstated period in one exam, her normal sensation in extremities during another exam, and her lack of spasms and tenderness in a third exam. But these findings are consistent with Gerstner's pain complaints. She never testified that she had constant disabling pain, or that her condition totally impaired the abilities tested in these exams. Instead, she said that her pain was triggered by *prolonged* sitting, standing, or activity and stress. The ALJ's analysis reveals that he misunderstood the nature of her fibromyalgia pain. The extent of fibromyalgia pain cannot be measured with objective tests aside from a trigger-point assessment. *See Vanprooyen*, 864 F.3d at 568; *Fibromyalgia, Diagnosis*, MAYO CLINIC, http://www.mayoclinic.org/diseases-conditions/fibromyalgia/diagnosis-treatment/diagnosis/dxc-20317823 (visited Nov. 27, 2017). Trigger-point testing on Gerstner pinpointed fibromyalgia as the source of her pain, and her pain complaints were consistent with her prescription for methadone, an opioid not intended for mild or acute pain. *Methadone Hydrochloride*, PRSCBR'S. DIG. REFERENCE, http://www.pdr.net/drug-summary/Methadone-Hydrochloride-Intensol-Oral-Concentrate-methadone-hydrochloride-3464 (visited Dec. 22, 2017).

Second, the ALJ unjustifiably concluded that Gerstner's pain was not disabling because an examining physician recommended that she engage in "aerobic activity several times a week" and a physician's assistant who treated her was concerned about her "inadequate physical activity." These general recommendations of physical activity do not contradict Gerstner's alleged limits from fibromyalgia. Gerstner testified that she could not do "exercise," but she did not explain what she considered exercise. Because the examining physician and the physician's assistant did not elaborate on

the type, duration, or intensity of the physical activity they would recommend, these medical sources may have had in mind activity that was within Gerstner's alleged limits—for instance walking a few times a week for a few minutes each time. Furthermore, the examining physician said her recommendation was only a "potential treatment," probably because she deferred treatment of Gerstner's fibromyalgia to other doctors who knew her limits. More importantly, the record reflects that at the time of the hearing, Gerstner was totally inactive, undermining any suggestion that she could exercise beyond her alleged limits.

Third, the ALJ questionably concluded that Gerstner exaggerated her pain because she was able to function without taking fibromyalgia drugs for six months when she was uninsured. Gerstner and her attorney explained at the hearing that the reason for the 6-month hiatus in her pain treatment was her loss of health insurance. The ALJ, however, failed to consider her explanation before inferring that this gap somehow proved that her pain was not as severe as alleged. *See Garcia v. Colvin*, 741 F.3d 758, 761-62 (7th Cir. 2013); *Craft v. Astrue*, 539 F.3d 668, 679 (7th Cir. 2008).

Lastly, the ALJ wrongly relied on psychiatric notes reflecting that Gerstner had searched for a factory job to conclude that she was able to work. The ALJ said this job search "suggests that she did indeed retain the ability to perform work-related activities," and the Commissioner argued that her job search undermines her complaints of disabling pain. But the job search, on its own, is not evidence that she embellished her pain, because a claimant who looks for work after claiming a painful disability may have "a strong work ethic or overly-optimistic outlook rather than an exaggerated

condition." *See Ghiselli v. Colvin*, 837 F.3d 771, 778 (7th Cir. 2016); *Hill v. Colvin*, 807 F.3d 862, 868 (7th Cir. 2015).

## III.

The ALJ failed to substantiate and explain his decision to grant Dr. Callaghan's opinion little weight, and the ALJ's adverse credibility determination regarding Gerstner's complaints of fibromyalgia pain is patently wrong. We therefore vacate the judgment affirming the denial of benefits and remand for further proceedings.