NONPRECEDENTIAL DISPOSITION

To be cited only in accordance with Fed. R. App. P. 32.1

# United States Court of Appeals

**For the Seventh Circuit**
**Chicago, Illinois 60604**

Argued December 18, 2019
Decided January 17, 2020

**Before**

DAVID F. HAMILTON, *Circuit Judge*

MICHAEL B. BRENNAN, *Circuit Judge*

MICHAEL Y. SCUDDER, *Circuit Judge*

No. 19-1540

| | |
|---|---|
| CARL GEBAUER, JR., <br> *Plaintiff-Appellant*, | Appeal from the United States District Court for the Central District of Illinois. |
| *v.* | No. 2:17-cv-02307-EIL |
| ANDREW M. SAUL, <br> Commissioner of Social Security, <br> *Defendant-Appellee*. | **Eric I. Long**, <br> *Magistrate Judge*. |

## O R D E R

Before her death at the age of 46, Davina Gebauer battled several disorders, including chronic fatigue, fibromyalgia, depression, and interstitial cystitis (bladder pain). Her husband, Carl Gebauer, now challenges the denial of her two applications for disability insurance benefits. See 42 U.S.C. § 405(g). He contends that the administrative law judge improperly relied on a court-appointed medical expert, afforded too little weight to the opinion of Davina's treating physician, misevaluated the severity of Davina's fibromyalgia, and improperly relied on testimony from a vocational expert. We conclude that the ALJ did not commit a legal error and that substantial evidence supports his findings. We therefore affirm the denial of benefits.

*Background*

Davina was 42 years old in 2011 when she first applied for disability insurance benefits, asserting that her fibromyalgia and chronic fatigue so impaired her that she no longer could work. Four years earlier, she had been diagnosed with fibromyalgia. The symptoms—including pain, difficulty standing and walking, and muscle cramps—progressed until she quit her retail job due to the discomfort. Up to that point, she had held jobs as a retail manager, a police dispatcher, an emergency-911 dispatcher, and a switchboard operator.

Around the time that Davina stopped working, she complained of fatigue and pain in her back, legs, and arms. In a Function Report that she submitted in connection with her application, Davina reported that she could not sit, stand, or walk for an extended period. She was able to attend to her own hygiene and personal care, but she had to sit down to get dressed and could not easily lift her arms to fix her hair. She helped with housework but often left chores unfinished. She also handled simple meal preparation and drove a car for short errands. But at times she also had trouble just turning the pages of a book. A few months after she submitted her application, a cardiac stress test revealed that Davina had "poor exercise capacity," though she could reach 85% of the age-predicted maximum heart rate and a workload of 7 METS (equivalent to light jogging).

As part of her application, Davina presented medical records from her primary-care physician, Dr. Gregory Deters, who saw her nearly twenty times in the two years between her application and the hearing. According to the treatment notes during that time, Davina complained about her pain or discomfort at almost every visit, although Dr. Deters routinely observed that she showed "no apparent physical distress" or only "mild" discomfort and twice noted a concern of "symptom magnification." In one report from 2011, Dr. Deters opined (by checking "yes" next to three attorney-provided questions) that Davina's pain prevented her from working full time "at even a sedentary position." By 2013, Davina was taking around a dozen medications, including prescriptions for her anxiety, heart rate, and pain (Percocet, Soma, Neurontin, and Toradol injections).

After a hearing in early 2013, an ALJ denied benefits, concluding that Davina's impairments were severe but not did not meet the demanding standard for disability under the Social Security Act. Davina sought judicial review. The district court remanded the case because the ALJ had not properly considered the subjective evidence

of Davina's pain, see SSR 16-3p, and the ALJ had not explained why he rejected the treating physician's opinion evidence.

In January 2015, Davina died of sudden cardiac complications. Under the Social Security Act, plaintiff Carl Gebauer, Jr., as her surviving spouse, could pursue a claim for benefits that should have been paid before her death. See 42 U.S.C. § 404(d). He has done so before the agency and in court.

The following year, the Appeals Council on remand consolidated Davina's case with a second application she had filed while proceedings in the district court had been pending. Davina's second application listed ailments—depression, bladder pain, back pain, headaches, memory loss, and irritable bowel syndrome—in addition to the fibromyalgia and fatigue that were the subject of her first application.

Carl submitted additional medical reports from Dr. Deters. One was a 2014 report stating (this time by checking boxes and answering a couple of specific, attorney-provided questions) that if Davina had tried to take on sedentary work, she would have required breaks totaling at least an hour per day in addition to normal breaks, and that she would have missed at least three days of work per month. Carl also presented a 2016 report in which Dr. Deters said that he had considered Davina's symptom magnification when he completed the earlier reports. The additional treatment notes from 2013 to 2015 reflect that Davina's symptoms remained largely unchanged.

A different ALJ presided over a second hearing in April 2017, at which testimony was presented by a court-appointed medical expert and vocational expert. The medical expert, a board-certified internist who had treated patients with fibromyalgia for nearly 30 years, testified that none of Davina's impairments met or medically equaled any impairment listed in 20 C.F.R. Part 404, Subpart P, App'x 1, which would lead to an automatic finding of disability. As for Davina's functional capacity, the medical expert opined that Davina would have required five-minute breaks every hour, but she could have lifted or carried about ten pounds frequently, walked a total of four hours over an eight-hour day, and reached overhead frequently. The vocational expert then testified that a person with those limitations and capabilities would be able to perform Davina's past jobs (police dispatcher and 911 dispatcher) as well as jobs in the national market (such as a document preparer or a letter addresser). The vocational expert further testified that there were over a thousand such jobs in Illinois. In calculating that number, he relied upon "Job Browser Pro," a software program that compiles data from the Bureau of Labor Statistics and the Census Bureau to create estimates of jobs at the

level of the Dictionary of Occupational Titles. Although this program is increasingly relied upon by vocational experts, the expert here acknowledged that its reliability has not been the subject of any peer-reviewed studies.

The ALJ concluded that, under the demanding standard of complete disability under the Social Security Act, Davina was not disabled before her sudden death. In his written decision, he applied the familiar five-step analysis, see 20 C.F.R. § 404.1520(a), and found that Davina did not engage in substantial gainful activity (step one) and suffered severe impairments of fibromyalgia, degenerative changes in the lumbar spine, sinus tachycardia (fast heart rhythm), hypertension, osteoarthrosis in the left knee, obesity, anxiety, and diabetes (step two). The ALJ then determined that Davina's impairments did not meet or equal the severity of a listed impairment (step three), and that Davina had the residual functioning capacity to perform light work with certain limitations (limited standing and/or walking a total of four hours during an eight-hour workday; occasional stairs, stooping, kneeling, and crouching; no ladders, ropes, or scaffolds; no crawling; no heights; limited to frequent overhead reaching, handling, fingering, gripping, pushing, and pulling; requiring at least a five-minute break every two hours). At step four, the ALJ relied on the vocational expert's testimony to conclude that Davina could perform her past work as a police dispatcher, 911-emergency dispatcher, and switchboard operator. At step five, he again relied on the expert's testimony to conclude that Davina could adjust to other work in the national economy as a letter addresser, document preparer, surveillance-system monitor, final assembler, or call-out operator.

In assessing Davina's residual functioning capacity, the ALJ considered evidence from her Function Reports and medical records, as well as expert testimony. He acknowledged Davina's difficulties with walking, standing, and lifting her arms but noted that, at various times, she could still attend to her own needs, care for pets, perform light housework, prepare simple meals, shop in stores and online, and communicate with friends by telephone and social media. He described Davina's complaints to Dr. Deters of pain and discomfort but noted that the doctor characterized her on their visits as "alert," recorded her discomfort as "mild," and did not record any difficulty walking, standing, or sitting nor note any symptoms (muscle atrophy, limited range in motion, or sensory loss) typically associated with disabling pain. The ALJ did not assign controlling weight or even significant probative weight to Dr. Deters's opinion, deeming it unsupported by medically acceptable clinical or laboratory findings and inconsistent with Davina's reported daily activities, Dr. Deters's own treatment notes, a conservative course of treatment (primarily medication), and the results of her

cardiac stress test. The ALJ afforded "great probative weight" to the medical expert's opinions.

The Appeals Council denied review, making the ALJ's decision the final position of the Commissioner. See 20 C.F.R. § 404.981. Carl sought judicial review, arguing that the ALJ retained a medical expert for the impermissible purpose of determining a residual functioning capacity, afforded too little weight to Dr. Deters's opinion, misevaluated Davina's subjective symptoms, and relied on unreliable testimony from the vocational expert. The district court affirmed the ALJ's decision.

### *Analysis*

This court directly reviews the ALJ's decision to determine "whether it applies the correct legal standard and is supported by substantial evidence." *Summers v. Berryhill*, 864 F.3d 523, 526 (7th Cir. 2017); 42 U.S.C. § 405(g).

### I. *The Medical Expert's Opinions*

Carl first argues that the ALJ was wrong to retain a medical expert to determine Davina's residual functioning capacity. He maintains that, if the ALJ had concerns about any aspect of Dr. Deters's opinion, the ALJ should have sought clarification directly from Dr. Deters. According to Carl, the "only possible reason" the ALJ retained an expert was to offer another opinion about Davina's residual functioning capacity, a purpose which Carl argues is "simply not … permitted."

We find no error. An ALJ may obtain a medical expert's opinion for several reasons including, in relevant part, "to clarify and explain the evidence or help resolve a conflict because the medical evidence is contradictory, inconsistent, or confusing" and to determine the claimant's residual functioning capacity. See HALLEX I-2-5-34(A)(2) (2016).[1] Further, the ALJ's retention of an expert was not only discretionary but prudent

---

[1] Carl does not rely on any specific statutory or regulatory prohibition. "HALLEX" is the term that Social Security cognoscenti use to describe the Social Security Administration's "Hearings, Appeals, and Litigation Law Manual." As best we can tell, its provisions are not binding law independent of the governing statutes and regulations. HALLEX says that it "communicates guiding principles and procedures to hearing level and Appeals Council adjudicators … [and] serves as a reference source for staff. . . ." HALLEX I-1-0-3 (available at https://www.ssa.gov). Circuits are split as to whether HALLEX is binding on ALJs. Compare, e.g., *Lockwood v. Comm'r*, 616 F.3d 1068, 1072 (9th Cir. 2010) (HALLEX is merely a non-binding, internal administrative guide); *Ferriell v. Comm'r*, 614 F.3d 611, 618 n. 4 (6th Cir.

in this case. The use of a medical expert can help ALJs resist the temptation to "play doctor," a label that usually produces a remand on judicial review, by evaluating medical evidence on his or her own. E.g., *McHenry v. Berryhill*, 911 F.3d 866, 871 (7th Cir. 2018) (reversing denial of benefits based on ALJ's own assessment of medical evidence, without testimony from medical expert); *Myles v. Astrue*, 582 F.3d 672, 677 (7th Cir. 2009); *Kurth v. Astrue*, 568 F. Supp. 2d 1020, 1031 (W.D. Wis. 2008) (remanding where ALJ failed to seek evidence from qualified medical expert about severity of claimant's fibromyalgia). A medical expert may be especially helpful when evaluating the severity of a condition—like fibromyalgia—marked by subjective and fluctuating symptoms. See, e.g., *Castile v. Astrue*, 617 F.3d 923, 927 (7th Cir. 2010) (affirming denial of benefits based in part on medical expert's opinion that claimant's chronic fatigue syndrome did not render her disabled).

Carl argues next that the ALJ erred in affording "great weight" to the medical expert's opinion. He contends that the expert's opinion was not entitled to such weight because it was at best "speculative" in that it relied on the results of a cardiac stress test, even though fibromyalgia cannot be assessed by objective tests, see *Gerstner v. Berryhill*, 879 F.3d 257, 264 (7th Cir. 2018), and no studies have proven a correlation between a cardiac test and fibromyalgia.

The expert here, however, relied on the results of the cardiac stress test not as direct evidence of Davina's fibromyalgia but rather to demonstrate Davina's overall physical condition. Carl's attorney cross-examined the expert about her opinions and the evidence used to support it. The ALJ pointed to more than the expert's testimony about the cardiac stress test when giving her opinion great weight. He highlighted her specialization in rheumatology, her experience treating fibromyalgia, her familiarity with Davina's medical record, her knowledge of the relevant listings of impairments from almost 30 years testifying at disability hearings, and the consistencies between the expert's opinion and Davina's medical record. See C.F.R § 404.1527(c) (listing factors to consider when assigning weight to a medical opinion).

---

2010) (same); *Power v. Barnhart*, 292 F.3d 781, 785–86 (D.C. Cir.2002) (same); *DeChirico v. Callahan*, 134 F.3d 1177, 1184 (2d Cir.1998) (same), with S*have v. Apfel*, 238 F.3d 592, 596–97 (5th Cir. 2001) (prejudicial violations of the HALLEX entitle a claimant to relief); *Newton v. Apfel*, 209 F.3d 448, 459–60 (5th Cir. 2000) (same). But we would expect at least an explanation if an ALJ departed from its instructions in a material way.

As the other side of the same coin, Carl argues that the ALJ afforded too little weight to Dr. Deters's opinion, particularly his view that Davina could not work at all. Carl contends that the ALJ erred in finding that Dr. Deters's opinion was inconsistent because the evidence relied upon by the ALJ in making that determination (namely, the cardiac stress test and the lack of symptoms typically associated with pain) is "unrelated" to fibromyalgia. Carl further argues that the ALJ ignored other evidence— Davina's roster of medications and the results of two musculoskeletal exams showing tenderness—which supported Dr. Deters's opinion.

In claims like this that were filed before 2017, a treating source's opinion is entitled to controlling weight if it is supported by sound medical evidence and a consistent record. See 20 C.F.R. § 404.1527(c)(2); SSR 96-8p. When an ALJ does not give a treating source's opinion controlling weight, then that opinion should be weighed based on the nature and extent of the treatment, the treating source's area of specialty, and the degree to which the opinion is consistent with the record and supported by other evidence. *See* 20 C.F.R. § 404.1527(c)(2); SSR 96-8p.

Here, the ALJ did not make a outcome-determining legal error in deciding not to give Dr. Deters's opinions controlling or probative weight. On one hand, we agree with Carl that the ALJ wrongly discounted Dr. Deters's opinions as not being supported by medically acceptable tests, given the absence of such evidence in fibromyalgia cases. See, e.g., *Gerstner*, 879 F.3d at 264 (fibromyalgia "cannot be measured with objective tests"). On the other hand, an opinion is entitled to controlling weight only if it is supported both by medical findings and a consistent record. See 20 C.F.R. § 404.1527(c)(2). Here, the ALJ described at length how Dr. Deters's opinions conflicted with his own treatment notes, Davina's daily activities, the cardiac stress test, and a lack of symptoms typically associated with pain. He also discounted Dr. Deters's reports because they consisted of simple forms where the doctor checked "yes" next to attorney-provided questions, not open-ended assessments of Davina's capacities and limitations.

Carl's contention that the ALJ should not have relied on that evidence because it was "unrelated" to fibromyalgia is rooted in misapprehension. The Social Security Administration's guidance on evaluating fibromyalgia, see SSR 12-2P, limits only the evidence used to *diagnose* the disease as a medically determinable impairment (step two in the five-step analysis). It does not limit the evidence an ALJ can consider in evaluating the *severity* of fibromyalgia for purposes of determining a residual functioning capacity. Further, the Social Security Administration's guidance on how to

evaluate pain (fibromyalgia's chief symptom) directs ALJs to consider the very symptoms that the ALJ considered here. See 20 C.F.R. § 404.1529(c)(2) ("[E]vidence of reduced joint motion, muscle spasm, sensory deficit or motor disruption … is a useful indicator to assist us in making reasonable conclusions about the intensity and persistence of your symptoms.")

Finally, the ALJ did not ignore evidence that supported Dr. Deters's opinion. He considered Davina's medications and pointed to evidence that the medications offered relief. He also discussed evidence of the musculoskeletal exams that Carl asserts were "wholly omit[ted]" from the opinion. The ALJ explained that the results of the first exam showed only some tenderness and acknowledged that, although the second exam showed tenderness wherever Davina was touched, the medical notes from that visit also reflected that her joints had good range of motion and that her medications provided pain relief. The ALJ also considered that, in a follow-up exam, her results were "within normal limits."

## II. *Severity of Davina's Condition*

Next, Carl argues that the ALJ improperly evaluated the severity of Davina's condition by cherry-picking details from her daily activities and citing evidence that was "disconnected" from fibromyalgia itself. Without identifying any specific examples of activities overlooked by the ALJ, Carl argues that the ALJ did not "cite the source of his findings" and "did not paint a full picture" of her daily activities.

But the ALJ's evaluation was not inappropriate for evaluating the severity of fibromyalgia. An ALJ must consider the longitudinal record of a fibromyalgia patient because symptoms can wax and wane. See SSR 12-2P(VI)(D). The ALJ's opinion—taken as a whole—did not ignore Davina's reports that she struggled daily with getting dressed, could not walk or stand for extended periods, and often left chores unfinished due to fatigue and pain. The ALJ considered the evidence of Davina's daily activities in balance with the rest of her record, including evidence that her doctors noted "no apparent physical distress," even on the days when she complained of pain, and a lack of evidence that she had "significant sensation loss, significantly reduced joint motion, muscle spasms, muscle atrophy, motor weakness," or other symptoms "associated with the pain that would prevent her from performing sedentary work." See 20 C.F.R. § 404.1529(c)(1), (3).

### III.    *The Vocational Expert's Database*

Finally, Carl argues that the ALJ erred in considering testimony from a vocational expert who relied on the Job Browser Pro software that he acknowledged had not been studied for reliability by any peer-reviewed publication. However, any weight that the ALJ placed on that testimony was not decisive for his ultimate decision to deny Davina benefits. In evaluating disability claims under 20 C.F.R. § 404.1520(a)(4), an ALJ considers in step five whether a claimant's residual functioning capacity makes it possible for her to adjust to a different job, and, if so, the ALJ will find that she is not disabled. See id. at (a)(4)(v). But an ALJ reaches this part of the analysis only if the ALJ first concludes in step four that a claimant could not perform any of her past jobs. *See id.* at (g)(1). Here, the ALJ determined that Davina could have. Further, when Carl objected to the vocational expert's testimony at the hearing, the ALJ offered him an opportunity to bring in an expert to testify about Job Browser Pro's supposed unreliability. Carl declined to do so.

Accordingly, we affirm the judgment of the district court affirming the denial of benefits.